**Fidel RAMOS, David Lee Anderson, Sadiki Lisimba Ajamu (a/k/a Eugene Collins), Alexander Roses, Mark J. Menchetti and Lester Lazenby et al., Plaintiffs,**

v.

**Richard D. LAMM, Allen L. Ault, John Perko, Edgar Fox and William Wilson, Defendants.**

No. 77-K-1093.

United States District Court,
D. Colorado.

Dec. 20, 1979.

As Amended Dec. 26, 1979.

On Motion for Stay of Execution
Feb. 21, 1980.

James E. Hartley and Hugh Q. Gottschalk, ACLU Foundation of Colorado, Inc., Denver, Colo., Peggy A. Wiesenberg and Ralph I. Knowles, Jr., The Nat. Prison Project, Washington, D. C., Dudley P. Spiller, Jr., Denver, Colo., The Colorado Coalition of Legal Services Programs, for plaintiffs.

J. D. MacFarlane, Atty. Gen., Joseph N. de Raismes, First Asst. Atty. Gen., Richard H. Goldberg, Jeffrey Weinman, and Maureen E. Phelan, Dennis Sousa, Henry L. Solano, Asst. Attys. Gen., Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

This action is a suit under 42 U.S.C. § 1983[1] challenging conditions of confinement at the maximum security unit of the Colorado State Penitentiary at Canon City, Colorado. Plaintiffs are persons incarcerated in this maximum security unit, and de-

---

1. This statute was passed by Congress on April 20, 1871 and provides as follows:

"Every person who, under color of statute, ordinance, regulation, custom, or usage of any State or Territory, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Jurisdiction is provided at 28 U.S.C. § 1343(3).

fendants include the governor of Colorado, the executive director of the Department of Corrections, and the superintendent of the maximum security unit. The suit was filed *in forma pauperis* on November 30, 1977. After appearance of counsel for plaintiffs and amendment of their complaint, the suit was certified as a class action on March 31, 1978, pursuant to F.R.Civ.P. Rule 23. The class consists of all persons who are now or in the future may be incarcerated in the maximum security unit, or the new maximum or close security unit, of the Colorado Department of Corrections.

On May 17, 1978, a motion to dismiss, or in the alternative to abstain, was denied, and defendants answered the amended complaint on June 9, 1978. After a year and a half of discovery and months of efforts to reach a settlement, the pretrial order was filed. On October 5, 1979, the eleventh hour before trial, the Honorable Richard D. Lamm, Governor of Colorado, filed a letter with the court concerning the parties' efforts to reach a settlement. In the letter Governor Lamm detailed the unsuccessful efforts made to bring the various constituencies of the state government into consensus and requested an additional one week's continuance of the trial date in order to further these efforts. The request was granted. In part of his letter, Governor Lamm stated, "I understand that the parties must prepare for trial, but it is my earnest hope that a consensus can be reached before trial, one way or another. I believe that an agreement negotiated by the parties in good faith in this matter should be given a chance to succeed, which it can if there is a legislative consensus in support of it. But I cannot agree to the document which I have reviewed absent such a consensus, and I do not believe that it would be in the interest of the court or the parties for me to do so." Trial began on October 15, 1979 and lasted for five weeks. Testimony from inmates, state officials and numerous experts was received. Thousands of pages of documentary evidence were received, and a firsthand inspection of the prison was made. After eight hours of final arguments a bench ruling was made in favor of plaintiffs holding that the conditions at the Canon Correctional Facility deprive persons incarcerated there of rights clearly protected by the United States Constitution and violate numerous rules of state law. This opinion supplants the bench ruling.

## THE CONTEXT OF JUDICIAL DETERMINATION

Across the country, civil rights cases filed by state prisoners in federal courts have increased from 2,030 in 1970 to 11,195 in 1979, an increase of 451.5 per cent. Administrative Office of the United States Courts, 1979 Annual Report of the Director 59–62 (1979).[2] In the District of Colorado, for the twelve month period ending June 30, 1979, 155 civil rights cases were commenced by state prisoners, compared to 106 in 1978, 51 in 1977, and only 21 in 1976.[3] This represents an increase of 50 per cent since 1978, and almost 750 per cent since 1970. As of June 30, 1979, 115 such cases were pending in this district, compared to only 65 as of the same time in 1978.[4]

From the Colorado State Penitentiary alone, 150 civil rights cases have been filed since 1976. Of these 150, 84 were dismissed and two others were decided in favor of defendant state officials.[5] In comparison, in only four cases was there any disposition, preliminary or otherwise, in favor of plaintiff inmates. Two cases are on appeal, nine have been stayed or consolidated with this

---

**2.** For a study of state prisoner civil rights actions, *see* Turner, *When Prisoners Sue: A Study of Prisoner Section 1983 Suits in the Federal Courts*, 92 Harv.L.Rev. 610 (1979).

**3.** Administrative Office of the United States Courts, 1979, 1978, 1977 and 1976 Annual Reports of the Director.

**4.** 1979 and 1978 Annual Reports, at A–23 and A–25, respectively.

**5.** Nationwide, of the 10,301 state prisoner civil rights actions disposed of during the twelve month period ending June 30, 1979, 9,526, or 92.47 per cent, were disposed of before pretrial, and only 358, or 3.47 per cent, went to trial. 1979 Annual Report, at A–30—A–31.

action, 39 others are pending, and ten have had assorted histories. Of the 92 case dispositions, 86 were either dismissed or decided in favor of state officials, accounting for more than 93 per cent of the results. Such a history hardly indicates that the federal judiciary has jumped at the chance to interpose itself between Colorado officials and persons confined at the State penitentiary. The contrary is true.

A great deal of this deference to state officials has been due to the substantial reluctance of federal courts to intervene in matters of prison administration. For many years, the so-called "hands off" policy was a near absolute jurisdictional bar to federal court review of alleged violations of prisoners' asserted constitutional rights. Language from the Tenth Circuit is suggestive of the attitude that "[c]ourts are without power to supervise prison administration or to interfere with the ordinary prison rules or regulations." *Banning v. Looney*, 213 F.2d 771, 771 (10th Cir. 1954), *cert. denied*, 348 U.S. 859, 75 S.Ct. 84, 99 L.Ed. 677 (1954). *See Stroud v. Swope*, 187 F.2d 850, 851 (9th Cir. 1951), *cert. denied*, 342 U.S. 829, 72 S.Ct. 53, 96 L.Ed. 627 (1951); *Garcia v. Steele*, 193 F.2d 276, 278 (8th Cir. 1951); and *Dayton v. Hunter*, 176 F.2d 108, 109 (10th Cir. 1949), *cert. denied*, 338 U.S. 888, 70 S.Ct. 184, 94 L.Ed. 545 (1950).[6] With *Cooper v. Pate*, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (per curiam), however, the courts began to open their doors to prisoner complaints. In *Cooper*, a state prisoner alleged that he was denied religious freedom and discriminated against in his religious practice. The Seventh Circuit affirmed the district court's dismissal:

'We think that it is well settled that it is not the function of the courts to superintend the treatment and discipline of prisoners in penitentiaries, but only to deliver from imprisonment those who are illegally confined.' *Stroud v. Swope, Warden*, 9 Cir., 187 F.2d 850, 851. A prisoner may not approve of prison rules and regula-

tions, but under all ordinary circumstances that is no basis for coming into a federal court seeking relief even though he may claim that the restrictions placed upon his activities are in violation of his constitutional rights. [Citations omitted.]

324 F.2d 165, 167 (7th Cir. 1963) (quoting *United States ex rel. Morris v. Radio Station WENR*, 209 F.2d 105, 107 (7th Cir. 1953)). On certiorari, the Supreme Court reversed. "Taking as true the allegations of the complaint, as they must be on a motion to dismiss, the complaint stated a cause of action and it was error to dismiss it." *Cooper v. Pate*, 378 U.S. at 546, 84 S.Ct. at 1734.

By 1972, the Supreme Court said in *Cruz v. Beto*, 405 U.S. 319, 321–22, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (per curiam):

Federal courts sit not to supervise prisons but to enforce the constitutional rights of all 'persons', including prisoners. We are not unmindful that prison officials must be accorded latitude in the administration of prison affairs, and that prisoners necessarily are subject to appropriate rules and regulations. But persons in prison, like other individuals, have the right to petition the Government for redress of grievances which, of course, includes 'access of prisoners to the courts for the purpose of presenting their complaints.' *Johnson v. Avery*, 393 U.S. 483, 485, 89 S.Ct. 747, [749] 21 L.Ed.2d 718 [721]; *Ex parte Hull*, 312 U.S. 546, 549, 61 S.Ct. 640, 641, 85 L.Ed. 1034 [1035.]

The court reversed the lower courts' dismissal and granted petitioner's motion for leave to proceed *in forma pauperis*.

The Tenth Circuit followed suit in *Bethea v. Crouse*, 417 F.2d 504 (10th Cir. 1969). Discussing its past dealings with prisoner complaints, the Court of Appeals stated at 505–06 (emphasis added):

We have consistently adhered to the so-called "hands off" policy in matters of

---

**6.** For a history and discussion of the "hands off" doctrine, *see* Note, *Beyond the Ken of the Courts: A Critique of Judicial Refusal to Review the Complaints of Convicts*, 72 Yale L.J.

506 (1963); Comment, *Constitutional Rights of Prisoners: The Developing Law*, 110 U.Pa.L. Rev. 985 (1962).

prison administration according to which we have said that the basic responsibility for the control and management of penal institutions, including the discipline, treatment, and care of those confined, lies with the responsible administrative agency and is not subject to judicial review unless exercised in such a manner as to constitute clear abuse or caprice upon the part of prison officials. See *Graham v. Willingham*, 384 F.2d 367 (10th Cir. 1967). Also see *Banning v. Looney*, 213 F.2d 771 (10th Cir. 1954); *Powell v. Hunter*, 172 F.2d 330 (10th Cir. 1949). *But being fully cognizant that one does not lose all his constitutional rights when he enters a prison*, see *Cooper v. Pate*, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 . . ., *we have never turned a deaf ear to a bona fide claim for relief based upon the deprivation of a constitutional right* when asserted by a federal or state prisoner, either in the nature of a mandamus or habeas corpus proceeding, or, as here, a claim under the Civil Rights Act.

*Accord, Gregory v. Wyse*, 512 F.2d 378, 381 (10th Cir. 1975), *Dearman v. Woodson*, 429 F.2d 1288, 1290 (10th Cir. 1970). In *Crouse*, inmates at the Kansas State Penitentiary complained, *inter alia*, that prison officials had stood by and not intervened when plaintiffs were assaulted by another inmate. The district court had granted summary judgment in favor of the warden, and the court of appeals reversed, finding that summary judgment was not appropriate. 417 F.2d at 507–10.

Defendants have pointed to several recent Supreme Court decisions which reiterate the policy of substantial deference to prison officials. See *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Jones v. North Carolina Prisoners' Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); and *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). I have read these decisions and, to the extent that they are relevant, I am bound by them. In fact, I have consistently followed this policy. See *Jackson v. Moore*, 471 F.Supp. 1068 (D.Colo.1979); *Marioneaux v. Colorado State Penitentiary*, 465 F.Supp. 1245 (D.Colo.1979); *Tuggle v. Evans*, 457 F.Supp. 1015 (D.Colo.1978); *Mingo v. Patterson*, 455 F.Supp. 1358 (D.Colo. 1978); *Sorenson v. Zapien*, 455 F.Supp. 1207 (D.Colo.1978); and *Brown v. McGowen*, 445 F.Supp. 468 (D.Colo.1978). But it is always the countervailing principle, in these decisions and others, that "a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Procunier v. Martinez*, 416 U.S. at 405–06, 94 S.Ct. at 1807–1808. As the Tenth Circuit said in *Battle v. Anderson*, 564 F.2d 388, 392–93 (10th Cir. 1977):

We, too, abhor any situation or circumstances requiring the intervention of the federal courts in matters involving the administration, control and maintenance by the sovereign states of their penal systems. It is a delicate role assigned to the federal courts to display that restraint so necessary 'in the maintenance of proper federal-state relations.' *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). We are cognizant of the complexity of problems confronting the states in upgrading not only a host of state institutions and facilities but in properly maintaining them both physically and with adequate personnel. If we were to close our eyes to the financial burdens a variety of 'piecemeal' federal court orders would impose upon the states and their taxpayers we would refuse to come to grips with reality. We are in sympathy with the ever increasing budgetary demands upon state taxpayers. There are constitutional and statutory limits on a state's capacity to finance capital outlays. No one state governmental body is authorized to dictate a specific course of action. The governmental

wheels often turn slowly simply as a result of pressure generated by a multitude of needs. Those charged with the administration of state government must pick and choose, set priorities and goals, many of which must later be abandoned or delayed because of unforeseen emergencies. Thus, it is in recognition of these problems and pressures that this court is sincerely reluctant to enter the arena involving the issues presented. The fact is, however, that the *issues* are jurisdictionally before us, just as they were jurisdictionally before the District Court. They have not been invited or solicited. *We are guided by the fact that the United States Supreme Court has not wavered in its holding that the Eighth Amendment to the United States Constitution prohibiting the imposition of cruel and unusual punishment is, inter alia, intended to protect and safeguard a prison inmate from an environment where degeneration is probable and self-improvement unlikely because of the conditions existing which inflict needless suffering, whether physical or mental. Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). [Emphasis added.]

■ As I have stated in my bench ruling, there is, from the beginning of my assignment to this case to the present time, a complete and utter distaste for having to cross that Rubicon which separates the federal government from the state government. In addition to the cited decisions, the history which I have recounted shows that this circuit and district have shown great deference to prison officials, especially toward the Colorado State Penitentiary and the 150 cases that have been filed from there in the past three years. Nevertheless, the plaintiffs have presented substantial, often compelling, evidence of long existing and continuing constitutional violations. Except in fashioning the necessary relief, deference is no longer possible.

## JURISDICTION

■ It is a well-settled rule that civil rights plaintiffs are not required to exhaust state remedies before seeking relief in federal court. *See Wilwording v. Swenson*, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971) (per curiam); *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); *Houghton v. Shafer*, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968) (per curiam); *Damico v. California*, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967) (per curiam); *McNeese v. Board of Education*, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). *Accord, Clappier v. Flynn*, 605 F.2d 519, 528 (10th Cir. 1979). *Wilwording* is particularly relevant since in that case state prisoners complained of conditions of confinement in the maximum security unit of the Missouri State Penitentiary. The complaint was fashioned as a petition for habeas corpus and both the district court and the Eighth Circuit dismissed the petition for failure to exhaust state remedies. 404 U.S. at 249, 92 S.Ct. 407. After stating that "[s]ection 2254 does not erect insuperable or successive barriers to the invocation of federal habeas corpus," *id.* at 250, 92 S.Ct. at 408, the court said that the prisoners' *pro se* complaint could "also be read to plead causes of action under the Civil Rights Act." *Id.* at 251, 92 S.Ct. at 409. The court continued:

Petitioners were therefore entitled to have their actions treated as claims for relief under the Civil Rights Acts, not subject, on the basis of their allegations, to exhaustion requirements. The remedy provided by these Acts 'is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.' *Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 [503] (1961); *McNeese v. Board of Education*, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *Damico v. California*, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967). State prisoners are not held to any stricter standard of exhaustion than other civil rights plaintiffs.

*Houghton v. Shafer,* 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968). The rule is applicable here.[7]

## FINDINGS OF FACT

In Appendix I (Revised) to the Pre-Trial Orders there are 1,727 separate, numbered paragraphs containing stipulations and proposed stipulations of fact, excerpts of sworn testimony and summaries of statistics. Some of these paragraphs contain subheadings and, in their entirety, the data covers 229 pages. During trial, thirty-six additional witnesses were called and testified. Over four hundred exhibits were received. It would be pointless to set forth all of this evidence in detail. With only two obvious exceptions, the testimony was credible and largely uncontradicted.

As will be stated more explicitly, the evidence in this case shows that prisoners in the Canon Correctional Facility are housed under conditions which fall below all recognized constitutional and professional standards. Those conditions include insufficient living space with inadequate sanitation, ventilation, light, heat, noise control and fire safety; lack of protection from violence; massive and pervasive idleness because of lack of productive activity; inadequate medical care (both mental and physical); and unnecessarily restrictive classification of prisoners into security classifications which exacerbate physical and mental deterioration.

The old maximum security prison of Colorado ("Old Max") began as a territorial prison back in the late 1860's before Colorado became a state. For the most part, Old Max was built in the early part of this century. With the exception of the new administration building, the prison is antiquated and shows scars left by generations of neglect.

Every report which has been issued in the last ten years has decried the inadequate facilities and sporadic rehabilitation at Old Max. The institution has been studied to death.

In 1973, a task force from the American Correctional Association found that Old Max was an "outdated, unmanageable facility" which could not be efficiently staffed due to its design. A year and a half later, the report by the Attorney General to defendant Lamm on the events and causes of the May 18, 1975 riot found that Old Max was "antiquated" and "insecure" and recommended studying the possibility of razing the cellhouses or gutting their interiors in their entirety. In February 1977, the Corrections Master Plan which was submitted to defendant Lamm and the Colorado State Legislature recommended that Old Max be phased out as a prison. Its use as a medium security prison was considered and rejected.

In February, 1978, the Department of Corrections commissioned yet another master plan. A consultant familiar with reuse and modification of existing correctional facilities, whom the Department of Corrections hired to study Old Max, found that with the exception of the new administrative building, all other facilities at Old Max, including the perimeter wall should be demolished or otherwise decommissioned so that inmates will not be housed or employed in those buildings. At the time of this study, the Department of Corrections supported demolition of all buildings at Old Max except the administration building. Paul Silver, a nationally recognized corrections architect hired by the defendants, has stated that each and every major living

---

7. Several lower courts have attempted to establish an exhaustion requirement in prisoner civil rights litigation but have been reversed by the courts of appeal. *See McCray v. Burrell,* 367 F.Supp. 1191 (D.Md.1973), *rev'd,* 516 F.2d 357 (4th Cir. 1975), *cert. dismissed as improvidently granted,* 426 U.S. 471, 96 S.Ct. 2640, 48 L.Ed.2d 788 (1976) (per curiam); *Hardwick v. Ault,* 517 F.2d 295 (5th Cir. 1975). *McCray* provided the Supreme Court with an express opportunity to require that state prisoners exhaust state remedies before seeking federal civil rights relief, but the court dismissed its writ of certiorari as improvidently granted, 426 U.S. at 471, 96 S.Ct. 2640, after the issue had been briefed and argued on its merits. Four members of the court nonetheless expressed agreement with the Fourth Circuit's decision that exhaustion is not required. *Id.* at 471–75, 96 S.Ct. 2640.

area at Old Max is unfit for human habitation.

Although Colorado has appropriated funds to build a new maximum security prison and a new close security prison, these facilities are not scheduled to be opened until January or February 1981. In the interim, prisoners are forced to live in intolerable conditions at Old Max.

Old Max was built over the years in a random fashion on a site stepping up a steep "hogback" hill at the west end of Canon City. Buildings, fences, walls and towers have been added over the years without an overall plan for development.

Due to its haphazard evolution, Old Max is a collection of unmanageable and unsecurable building components. A relatively new administration building and diagnostic center front the public road and form the outer facade of the prison. Behind the walls, the prison consists of three large cellblocks—1, 3, and 7. The central building which houses the school, auditorium, law library, main kitchen, dining rooms, and a few offices is part of the same building that houses cellhouse 1. The prison infirmary which serves all 3 prisons in Canon City is located deep within the Old Max complex near cellhouse 3. In the basement of the infirmary there is a small housing unit known as cellhouse 5 for "trusty" prisoners; upstairs is a clutch of carrels for the tiny and wholly inadequate mental health department. Beyond the North Wall is a small industry row. Outside the walls on the east side of the prison is a small obsolete building known as cellhouse 4 which originally was used as the Colorado Women's prison and is now used to house minimum security prisoners assigned to Old Max.

The main living areas of Old Max are unfit for human habitation. Housing facilities are totally obsolete and do not comply with minimal architectural standards. Cell-

houses 1 and 7 house approximately 800 prisoners in high multi-storied open tiers. Each cellhouse consists of 2 concrete cellblocks, with 4 tiers of cells back to back in 2 parallel rows with an open gallery between them. There is no room for prisoners to move. Most cells provide for barely one half the square footage of space required by modern correctional standards.[8] Tiers are narrow and floor space is limited. As a result, prisoners live with constant jostling in very restricted space.

At one point, Colorado planned to tear down cellhouse 7. As recently as 1975, it was closed. However, after the May 1975 riot, cellhouse 7 was reopened so prisoners could escape the overcrowded conditions which existed in cellhouse 1.[9] Now the population in those cellhouses has increased.

Cellhouse 3 consists of 100 segregation cells in a concrete building with 10 separate wings for prisoners. It has two floors. Each floor has 2 wings of interior cells back to back. In addition, cellhouse 3 has 6 maximum isolation cells known as "the hole" on the bottom floor behind the officer control cage and a similar wing upstairs for death row. There is a special section on the second floor known to the staff as the "intensive management unit" and to the prisoners as the "dog cages." Both terms are accurate. Prisoners in cellhouse 3 are locked in their cells an average of 23 hours a day. The cells do not provide the 80 square feet required for prisoners in segregated status by the American Correction Association or the 60 square feet accepted by *Battle v. Anderson.*

Environmentally Old Max is inadequate to meet the health and safety needs of prisoners in the correctional system. Buildings are in a serious state of disrepair. The roof in cellhouse 1 has been leaking in the south, north and front sections for several months. Previous repairs were ineffective. The roof in cellhouse 3 is deteriorated and has also been leaking over a major portion of the cellhouse.

8. In cellhouse 7, most cells are 31.5 square feet. In cellhouse 1, cells are 35 square feet.

9. In May of 1975, the population in cellhouse 1 was 357 and the Attorney General's Investigation found that prisoners, line officers and administrators all agreed that it had to be drastically reduced.

Plumbing throughout Old Max is unsanitary, inadequate and poses an imminent danger to public health. Cellhouse 3 does not have hot water, even though minimum standards for correctional institutions require hot water as a fundamental health measure. Cellhouses 1 and 7 cells now have hot water.

Throughout the institution, there are leaking water pipes. In cellhouse 7, continuing problems with leaking plumbing have caused leaks into adjacent and lower cells. Moreover, malfunctioning toilets and deficient venting of the plumbing system have caused sewage to drain into sinks in adjacent and lower cells.

Shower areas have not been maintained in clean, sanitary and safe condition. Bath water has been impounded in shower drains and troughs due to obstructed drains. Excessive moisture, humidity and overgrowths of mold, fungus and slime have resulted from inadequate ventilation. Missing ceramic floor tiles have made floors uncleanable and promote mold and slime buildup. The unsanitary conditions present a source of infection from fungal buildup and a hazard to users due to metal stubs sticking up through the floor and uncovered electrical boxes that are sources for electrical shock. In cellhouse 3, one inmate was burned on the arms, hands, neck, back and face by being exposed to excessively hot water in the shower; his injuries required plastic surgery.

The heating and ventilation system are antiquated and incapable of providing minimally adequate heat and ventilation. Cellhouses 1 and 7 have open 5–6 story interiors with two four-tier islands of cells surrounded by glass windows around the entire building perimeter. This design precludes the elimination of drafts, the adequate control of temperatures, and the even circulation of air. State health inspections have consistently cited extreme temperature variations between the first and fourth tiers. Ventilation equipment is frequently not in use. During the summer months, odors, excessive heat, and humidity are unbearable on the upper tiers. The lack of adequate ventilation causes stagnant air with foul odors; the continued presence of contaminants in the air; a lack of adequate displacement of body heat; personal discomfort; health and sanitary problems and an increase in frustration, stress and hostility among prisoners and staff. The ventilation systems in cellhouses 1, 3 and 7 cannot be upgraded to meet minimum standards without major alterations of the ventilation systems and buildings at uneconomical expense.

The noise levels in the living areas of Old Max are intolerable. Large and old cellblocks with large vaulted spaces, tremendous physical distances, open tiers, hard surfaces, and an absence of acoustical equipment create serious and harmful noise level problems. There is a direct correlation between high noise levels and high blood pressure, hypertension, nervousness, stress, loss of appetite and detrimental psychological effect. No measures have been taken to control or abate noise in any area of Old Max.

Lighting is inadequate for prisoners to read safely in their cells. Minimum standards require 30 foot candles; ordinary lighting for book reading should be 60–80 foot candles by architectural standards. Readings at Old Max for March, June and July 1979 showed lighting was only 10 foot candles. The cell lights by design are inadequate and impracticable for lighting purposes involving close eye tasks. Inadequate lighting has adverse effects on vision; moreover, insufficient lighting increases tension and fatigue among prisoners and guards.

The entire institution is a fire hazard. In the event of fire in old multi-tiered facilities like cellhouses 1 and 7, it is impossible to evacuate prisoners. Cellblocks are not divided into compartmentalized fire zones. There are neither smoke barriers nor smoke detectors. Twenty-four hour surveillance by guards is relied upon for fire detection, and fire fighting. Even the hospital has dead end corridors which present serious barriers to evacuation in case of emergency. The institution has been cited for numerous

violations of the National Fire Protection Association Standards.

Conditions in the food services areas at Old Max and the Diagnostic Unit fail to meet any known public health standards. The building housing the main kitchen is obsolete; in October 1978 the Department of Corrections determined that major structural improvements were not economically feasible. Walls are soiled with dirt. The wall tile throughout the main kitchen is not readily cleanable because of recessed grouting. Concrete floor areas have deteriorated and are not readily cleanable. Ventilation is inadequate throughout the main kitchen. The fan in the kitchen is ineffective and causes dust and lint to be blown over the food preparation area. Two barely functioning floor drains serve the entire kitchen. Excessive water collects around steam kettles, dishwashers, and the produce processing area. Storage shelves have been soiled with dirt. Rodent droppings have been found in the storeroom. Equipment is outdated and poorly arranged.

Inspections by the Colorado State Health Department have revealed persistent violations of health codes. As of July 17, 1979, the State Department of Health could not issue a Certificate of Inspection for the food service facilities because the facilities were not in substantial compliance with the "Rules and Regulations Governing the Sanitation of Food Service Establishments in the State of Colorado." Although some deficiencies were clearly laid to the outdated equipment and facilities, most deficiencies were caused by a lack of routine maintenance, operational and cleaning procedures. These unsanitary conditions have a direct impact on the health of the inmate population.

Many health and sanitation deficiencies at Old Max are the result of a lack of routine maintenance and cleaning programs. The present executive director, James Ricketts, is a professed stickler for cleanliness. Under his administration, a significant increase in cleaning activity has taken place but the facilities are still below standard. Poor housekeeping practices have been prevalent throughout the institution. Inspection after inspection cites cellhouses, corridors, and cells that are littered with trash and an accumulation of decayed food and other materials. As of July 1979, general repair and maintenance work at the prison was not being handled in a prompt and responsive manner by the industries division thus resulting in delays in repairs to plumbing, lighting and electrical systems.

Every expert who has examined Old Max has concluded that it would be both infeasible and uneconomical to renovate Old Max for continued use. Defendant, former Executive Director Ault, has stated that many health and safety deficiencies at Old Max are virtually impossible to correct because of inherently deficient design and construction. As of February 1, 1977, it would have cost at least 38 million dollars to make Old Max minimally habitable. Even if defendants were to upgrade individual buildings to minimize environmental health deficiencies, the design and layout of Old Max make it virtually impossible for officials to provide prisoners with adequate programming.

There is inadequate space at Old Max for programs and what space is provided is poorly designed. In order to prevent debilitation of prisoners, housing units must include adequate space for outdoor recreation, indoor recreation, lounge space and private activity spaces. Yet none of the major housing units at Old Max have day rooms, activity space or private conference areas. The random layout of buildings limits spaces available for programmed recreation. Moreover, the mazelike design and disorganized layout of the prison dictate a disproportionate amount of staff time to security and monitoring traffic. Staff are not available to oversee programs and activities. Former Director Ault recognized that the limitations of the 100 year old prison would make it difficult for the Department of Corrections to implement Colorado laws which require all inmates to work.

The most serious defect in the design of Old Max, however, is the inherent inability to provide prisoners with basic safety. The American Correctional Association report,

the Attorney General's report, the 1977 Master Plan and the Five Year Correctional Plan all found that the design of the prison makes it virtually impossible to provide prisoners with security. The haphazard growth of the institution and the nature of the site do not permit adequate surveillance.

Due to inadequate planning and design, the prison cannot be staffed efficiently to provide for security. So many walls and fences have been constructed within the perimeter of Old Max, it takes a disproportionate amount of staff to man the security towers; it is necessary to man 10 towers around the clock, to provide what is less than adequate surveillance. Because buildings, yards and walls have developed in a random fashion, inmate traffic around the prison is congested and confused. Moreover, there are a large number of blind spots which permit assaults and violent incidents to occur out of the sight of correctional officers. There are so many niches and crannies which are hidden from visibility at Old Max that officials have restricted prisoner movement and the use of outdoor space.

The cellhouses do not provide for safety. Housing contributes to violence between inmates often leading to severe injury and death. The design of cellhouses 1 and 7 fails to provide for visibility. The guards' cage at the far end of the cellhouse is inadequate for surveillance. There is no secure vantage point from which cell movement can be observed. Visual surveillance of the upper tier cells and most of the tiers is obstructed from the ground floor. Similarly, cellhouse 3 has 10 separate wings for housing prisoners. This design does not allow for visual surveillance and observation from the central control cage.

Old Max fails to meet life safety codes, building codes, health codes, fire safety codes, or other regulations relating to the safety of inmates and staff.

## IDLENESS

Old Max is characterized by massive and pervasive idleness. Although the defend-ants have been aware of the problem of idleness for years, nothing has been done to alleviate the dead time and boredom which dominate the lives of most prisoners at Old Max. In recent years, actions have been taken to restrict rather than to increase activity at the prison. No substantial effort has been made to increase jobs or programs or activities at Old Max nor are there any developed plans or funds for jobs, programs, activities or staff at the new prisons.

In 1973, the American Correctional Association found that idleness was responsible for more problems at Old Max than any other factor. Similarly, the report of the Attorney General on the events and causes of the May 18, 1975 riot at the Colorado State Penitentiary concluded that "there is too much 'dead' time during which inmates have no effective opportunity to engage in productive activity," and that "more work and recreation programs are needed."

While fully cognizant of these reports, prison officials began to restrict productive activity at Old Max. After 1975, officials tore down a substantial portion of industry row along the north wall eliminating the cannery, mattress factory, brick plant, shoe shop, butcher shop, tin shop, garbage shop, soap plant, blacksmith shop and tailor shop. For totally unexplained reasons, inmates do not even remove trash and garbage. Such removal is performed by an outside contractor. In 1977, after Allen Ault became Director, officials tore down the laundry which employed over 50 prisoners. In 1977, the officials tore down the general library and stopped providing any library services or books to prisoners. in 1976, the Warden of Old Max, after consultation with Governor Lamm, discontinued a number of inmate self-help groups at Old Max, including the Black Cultural Development Society, the Latin American Development Society, the Progressors, each of whose membership ranged from 100–200 prisoners. In 1977, officials discontinued the Alcoholics Anonymous Study Group which involved 234 prisoners. Later, the officials banned the inmate council and discontinued the inmate

radio station and the inmate newspaper. None of these jobs or activities has been reinstated or replaced.

The majority of prisoners at Old Max are unemployed. Such unemployed inmates in the general population are referred to as "transitional workers" or "TWs." These prisoners are eligible for jobs but are not assigned only because there are no jobs available. Even though TWs are not so assigned for disciplinary violations, they are forced to remain in their cells at least 20 hours a day. Not only are they denied employment opportunities, but because they are not workers, they are denied access to any constructive or productive activities such as hobbies or crafts and drug and alcohol treatment groups. Essentially, they are subject to double punishment because no jobs are provided.

Over a hundred prisoners at Old Max are confined in protective custody to escape the violent and unsafe conditions in the general population. They are there for their own safety, not because of misconduct. Even so, they are locked in their cells for at least 20 hours a day, and allowed to leave only for meals and showers, and for recreation twice a week. Prison rules deny them the opportunity to participate in employment, education, drug treatment programs, hobby activities and religious programs. In recent months they have had to forego one of the opportunities for recreation in order to go to the canteen.

One of the nation's leading experts in the field of corrections, John P. Conrad, testified that an excessive number of prisoners in protective custody is an indication of improper administration and inadequate staff. There is no legitimate penological reason for denying these inmates access to jobs and other constructive activity. The only reason for their forced idleness is that there is inadequate staff to provide protection outside the cells. That so many inmates are willing to endure these conditions is an indication of the level of concern for personal safety.

In short, many prisoners at Old Max are locked in their cells for more than 20 hours a day. Largely because of inadequate resources, prison rules and regulations severely restrict the opportunity of many inmates to participate in the few programs which do exist. The result is clear: only a small number of inmates are involved in programs and the rest spend their days confined in their cells with nothing constructive to do.

## ISOLATION

A large number of prisoners are subjected to long-term isolation under oppressive conditions of confinement. In cellhouse 3, prisoners are locked in their cells for more than 22 hours a day. They are not let out of their cells for daily showers or daily exercise. They are prohibited from participation in all programs. They are not allowed out of their cells for meals. Inmates in cellhouse 3 are denied the most rudimentary opportunity for human contact: treatment staff rarely come to cellhouse 3 and the three guards who are assigned to the cellblock rarely enter the cellblock areas to talk to prisoners.

Many prisoners are placed in cellhouse 3 for administrative reasons, not for punishment. Nonetheless, all prisoners in cellhouse 3, even those who are there because of serious mental problems, are treated in the same harsh and restrictive manner as those who are being punished. While punitive segregation is limited to specific lengths of time, administrative segregation is not. The total lack of activity in cellhouse 3 increases frustration and stress and causes mental and physical deterioration.

Defendants have done little or nothing to reduce the large numbers of prisoners in administrative segregation or to create opportunities for constructive activity. In fact, the number of inmates in administrative segregation has increased to the point that a second unit has been created in cellhouse 7.

## EMPLOYMENT

The State of Colorado has placed a clear statutory duty on the defendants to "as-

sume[ ] responsibility for training offenders in general work habits, work skills, and specific training skills that increase their employment prospects when released," to "[d]evelop industries that provide forty hours of work activity each week for all able-bodied offenders," and to "[p]rovide an environment for the operation of correctional industries that closely resembles the environment for the business operations of a private corporate entity." C.R.S., § 17–24–102(1)(a), (b), (c), (d) (1978).

Despite this duty, the majority of prisoners at Old Max do not participate in work and training programs. On July 1, 1978, less than ¼ of the prisoners at Old Max (206 out of the 847 prisoners) were assigned to jobs. As of June 4, 1979, nearly 400 prisoners were completely idle.

The industries program does not have sufficient staff to operate. Even though Old Max houses half of the prisoners who are incarcerated in the Colorado prison system, the Department has assigned only 13 of its 167 correctional industries staff to the production industries program at Old Max. Staff shortages have adversely affected prisoners in working status since staff cutbacks have resulted in prisoners spending more idle time in their cells.

There are very few production shops at Old Max. The shops which exist—tag plant, sign shop, print shop, machine shop, carpentry/furniture shop—employ few prisoners. Other jobs are primarily maintenance, clerical and "porter" jobs which do not keep prisoners busy and do not develop job skills. Industrial shops at Old Max are limited by a lack of qualified and trained personnel, old equipment which frequently breaks down, a lack of materials and a lack of stock and inventory. None of the industries shops offer journeyman or trade certificates. Not all shop supervisors are certified as vocational training instructors.

Defendants have not made any significant effort to create new industrial jobs for prisoners at Old Max. In the last three years, defendants have started only one new shop. Only two prisoners have been assigned to this shop since it opened. There is no formal follow-up to see if prisoners employed in prison industries are actually placed in private industry upon release.

There is little or no systematic training oriented to employment and no indication of joint planning and program development between correctional industries, vocational education and academic education. There is no overall program of vocational education and on-the-job training which extends from the classroom through work release opportunities and parole. There is no vocational training offered.

As previously stated, prisoners who are unemployed because no jobs are available are denied opportunities to participate in other productive activities because they are not employed. Unemployed or under-employed prisoners increase security problems for the staff. Gambling, alcohol and drug abuse, and fights fill the void created by the idleness.

Unemployment and idleness could become even worse at the new facilities. There are presently no firm plans for industry programs at New Max. The Department does not plan to move the existing tag plant, sign shop, print shop, machine/welding shop or the furniture shop to New Max. The Department intends to keep industry row at Old Max operating until the shops generate enough profit to support construction of industrial shops at New Max. However, the Department does not plan to permit prisoners at New Max or the new close security prison to be transported to Old Max to work in the interim. The Department estimates that at least a third of the prisoners at New Max will be ineligible for jobs, and that another third will be in protective custody. Jobs have not been developed for those in protective custody, although there has been some mention of possible "cottage industries" for such inmates. It has also not developed enough jobs for those prisoners at Old Max who are expected to move to the new close security prison.

## EDUCATION

Department statistics indicate that 75–85% of the prisoners at the penitentiary

lack a high school diploma. The average reading level of prisoners is 7th–8th grade level. Nonetheless, educational programs at Old Max are totally inadequate. Education has no priority in the Department of Corrections. The education department is most conspicuous by its absence. It suffers from lack of teachers, lack of funds, lack of space and lack of supplies. There is only one full-time civilian teacher at Old Max for a population of 800–900 prisoners. The other teacher who is assigned to the school spends little or no time teaching prisoners. The education department has a budget of $6,000, half of which has been diverted to other departments. In early 1979, the school did not have basic supplies such as pencils, paper, chalk and textbooks.

Hardly any inmates are given the opportunity to participate in educational programs. All prisoners in cellhouses 3 and 4, and all inmates in punitive segregation, administrative segregation and protective custody are totally excluded from educational programs. Prisoners with jobs are not permitted to participate in daytime educational programs.

Even prisoners' efforts for self-improvement have been severely limited and inhibited. There are no areas for study, either in the classroom area or elsewhere within the maximum security prison; most study must take place in inmate cells under the most adverse circumstances without adequate lighting, space or quiet for reading. The prison does not provide prisoners with funds for correspondence courses. At the time this suit was commenced, there was no general library at Old Max. One is presently planned but existing books are stored in a basement. Programs to encourage use of library books are nonexistent. Even though the Colorado State Librarian has a duty to provide general library services to prisoners at Old Max, there was no provision for a professional librarian or library services. C.R.S., § 24–90–107(1)(a) (1973). No volunteers are used anywhere in the institution.

## RECREATION

Recreation programs are important because they allow prisoners to release stress and avoid deterioration. Old Max does not have a sufficient number of recreational programs and opportunities for prisoners. Recreation programs principally consist of offender initiated athletic activities which are monitored by the recreation staff. They are clique oriented and serve to restrict the use of the gym and athletic equipment to a limited number of offenders. Non-athletic programs are almost non-existent. Access to the gym is limited. It is closed every day from 1–3 p. m. and entirely closed on Friday, Saturday and Sunday evenings.

Officials offer little in the way of programmed activities to combat boredom and idleness. The few group activities which are offered are restricted in number to 15 prisoners. In 1976, groups and community programs were open and memberships usually included from 60–100 prisoners. The only group activities offered consist of a bi-monthly discussion group for 15 prisoners every other Monday night, an Alcoholics Anonymous group for 15 prisoners on Wednesday and Friday nights, and a Narcanon group for narcotics addicts on Thursday nights. Chicano and black study classes have been discontinued, as well as the bridge and chess clubs.

## PERSONAL SAFETY

In recent years, Old Max has been plagued with violence and the fear of violence. In May 1975, there was a major riot at the maximum security prison. In August 1976, in response to the loss of lives, serious injuries, strongarming, violence and drug dealing, the Chief of the Division of Correctional Services and the Superintendent of Old Max ordered a massive lockdown of the entire prison population.

In September 1976, Governor Lamm declared that "the prison has fallen under a reign of terror," and called a special legislative session to address the situation. The legislature responded with bills making it a felony to make, possess, or bring contra-

band into the prison, making it a felony to assault a prison employee; increasing the penalties for escape; redefining riot offenses to include inciting, participating in, or failing to disperse from a riot; and requiring all visitors to submit to body and car searches.

The situation has not changed. In submitting the State Master Plan to Governor Lamm, Thomas Sheehan highlighted the dangerous atmosphere at Old Max stating: "[A]n environment of tension, anxiety and fear exists for both inmates and correctional staff. The result is an unsafe environment for both. Consequently, effective offender programming, including work activities, cannot occur." Recent studies have confirmed that the system is still fraught with tension and violence. In its investigation of cellhouse 3, the 1978 Interagency Crisis Committee found that:

> In the assessment of the staffing patterns of Cell House # 3, it became overwhelmingly evident to the committee that staffing was grossly inadequate. The physical facility has ten individual units that should require a minimum of one person on duty per shift to maintain observation and guarantee security. In addition, there should be three individuals unassigned that coordinate communication and programming in order to handle emergency situations and anything out of the ordinary. The present staffing finds 91 inmates in ten locations managed by three employees. There is no possible way that they can maintain security.

· Courts have taken judicial notice that most acts of violence go unreported in prison. *See, e. g., Pugh v. Locke*, 406 F.Supp. 318, 325 (M.D.Ala.1976). In general, the crime of rape at Old Max is unreported and prisoners report even fewer rapes than victims in the larger society. Even so, defendants' logs indicate an extraordinarily high amount of stabbings, assaults, fights and threats. Medical reports reflect an inordinately high number of suicide and self-mutilatory gestures. Contraband logs and shift reports reveal the excessive number of weapons which officials have uncovered.

The figures reflected in defendants' records represent the tip of the iceberg. Until recently, defendants did not keep records of the number of suicides or suicide attempts at the prison. Moreover, when this law suit began, defendants claimed that there were no readily available means of obtaining data on deaths or violent assaults. *See, e. g.*, Objections to Interrogatories 18–22 (October 2, 1978). Records which reflect violence are kept in different offices. To complicate matters, record-keeping practices have changed with each turnover in administration.

Perhaps one of the most accurate barometers of the fear that pervades Old Max is the extraordinary number of prisoners who have placed themselves in "protective custody" where they are deprived of almost all activities and are locked in tiny, cramped cells for all but a few hours a day. In July 1978, 18% of the prisoners at Old Max (135 of 765) were classified as protective custody. While the number of those in protective custody has been reduced to about 100, the number of inmates requesting protection has continued to increase.

The Attorney General's report on the events and causes of the May 18, 1975 riot identified faulty architecture, inadequate staffing, idleness, lack of constructive activity, inadequate guard training, racial tension, and poor contraband control as some of the underlying causes of violence. No significant improvements have been made.

As has been detailed, the architecture and layout of the facility make it virtually impossible to provide security. There are innumerable blind spots which permit assaults, stabbings and rapes to occur without surveillance. The design and staffing of all the major housing units contribute immeasurably to violence between inmates, often leading to severe injury and death. Prisoners have been brutally injured in every major living unit, including the "protective custody" units. What nooks, crannies and cells are not concealed are cluttered.

Defendants have failed to maintain adequate staffing at Old Max to protect prisoners from the unsafe physical surroundings.

(1977 Master Plan, p. 7.2; Ex. 2) When one considers that the prisoner population at Old Max is greater today than it was in 1975 and that staffing patterns in the housing units have not been significantly increased, it is clear that the understaffing at Old Max is even more dangerous to prisoners today than it was in 1975. In its report to Governor Lamm and Superintendent Wilson on the rash of suicides and suicide attempts, the Interagency Crisis Committee concluded that "almost everything they reviewed sooner or later related to inadequate staffing." After reviewing staffing levels, the committee found that "it became overwhelmingly evident that staffing was grossly inadequate." Although these reports recommended substantial increases in staffing, the Department of Corrections requested fewer new positions than it needed and in fact decreased security staff at the facility in fiscal year 1978–79.

Administrative turnover has contributed to the unstable environment for corrections and the high tension among staff and prisoners. (1977 Master Plan, p. 3.19; Ex. 2) In the past seven years, there have been six different Wardens at the Penitentiary, four Directors of the Division of Corrections, and four Executive Directors of the Department. As a result, policies and practices are constantly changing, leaving prisoners and staff in a constant state of flux.

An atmosphere of tension, anxiety and fear exists for both inmates and correctional staff. Reports dating to the Civil Rights Commission Study in 1973 have stressed the need for affirmative action to help lessen the disparity in race and culture between prisoners and guards. Although there have been some improvements, evidence reveals that only 4.4% of the correctional employees in the three Canon City prisons are black and only 6.5% are Hispanic.[10] Numerous reports have criticized the rural location of the prison which makes it particularly difficult to recruit professional staff and minorities. Given the cultural differences, the need for staff training is accentuated. Yet staff personnel receive no continuing training. Initial training was only recently instituted and, while it is laudable, it is grossly inadequate. No staff training meets any known professional or occupational standards.

## MEDICAL CARE

Defendants have been aware of grave and systemic deficiencies in the medical care delivery system at Old Max for years. In 1974, the state grand jury which investigated the maximum security prison found that staffing was inadequate in medical and psychological services. At that time the grand jury cautioned "this situation can no longer be ignored by the Colorado State Government." In 1977, the State Master Plan found that staffing, facilities and equipment in medical and mental health services were still inadequate to meet prisoners' health care needs. The prison is totally ill-equipped and unable to provide essential health services. Both in terms of physical and mental health delivery, the conditions in the penitentiary amount to an emergency situation. As one expert described the situation, it is a time bomb ready to explode into a disaster.

The infirmary at Old Max is responsible for providing medical services to all prisoners in the Canon City area including prisoners at Old Max, the medium security prison, the women's prison and the diagnostic center. Staffing is completely inadequate. The shortage in medical staff including doctors, nurses, and other support staff results in inadequate medical coverage. The primary care physician who has responsibility for the entire medical care program is paid for ¾ time for prison services, he operates his own private practice and spends about three to five hours on-site at the prison per week on patient care. He is available for telephone consultation with staff as his personal circumstances permit. Physician assistants are acting as physician substitutes rather than as physician extenders. One physician assistant has requested more physician supervision, but his request has gone

10. 30.37% of the prisoners are Hispanic and 27.50% are black.

unheeded. There are no registered nurses to staff the infirmary at night. There is no ancillary staff to provide 24-hour a day, 7-day a week service. Because the medical facility is understaffed, medical personnel are continually called upon to perform services for which they have not been trained and for which they are not qualified.

Contrary to every medical expert opinion, the Department uses inmate help in the medical services area. In 1977 when the law suit was filed, prisoners worked as nurses and were the sole providers of health care when civilian nurses and doctors were not present. Prisoners continue to work in such sensitive areas as the x-ray lab, the medical records department, dental services, the optometry department, physical therapy department, and the mental health department. The use of inmates in these areas violates the American Medical Association Standards for Correctional Health Care, and Colorado's own health care standards. The use of such inmates presents serious problems in that some inmates may abuse their positions for personal gain or be subject to pressure from other inmates for special favors.

A prison infirmary requires quick exits and easy access to an outside medical facility. Adequate transportation is necessary to enable inmates to have outside medical consultations with specialists. One of the most serious problems with the prison health care system is that the Department of Corrections does not provide numerous vital medical procedures on site and relies on transporting prisoners to Colorado State Hospital for treatment. There has been a serious breakdown in this system because security staff control and interfere with prisoner access to needed health care services. Over the years, reports have pointed to an ongoing conflict of interest and lack of cooperation between security and medical services. Medical decisions are not followed by security officers. Treatment is delayed and avoided. Illness or injury which could be treated successfully is neglected until near fatal conditions develop. One inmate, in otherwise excellent condition, suffered an appendicitis. After misdiagnosis and hours of delay before receiving competent attention, he was then delayed without any excuse at all, from being transported to the Colorado State Hospital. Transport was further interrupted and, upon arrival, adequate attention was not given until after the appendix ruptured and the inmate was placed in a life-threatening situation. The inmate was then transferred back to Old Max before he had adequately recovered and complications and further needless suffering ensued. Follow-up care was delayed and incompetent. Were it not for the fact that the inmate was previously in superb condition because of his training as a champion weightlifter, he might have died. It is certain that his suffering was needlessly prolonged and that the treatment he received was inexcusably delayed and inadequate.

Another inmate, through bureaucratic indifference, was forced to engage in activities expressly prohibited by a physician. Though suffering from exceedingly painful spinal disc problems and consequent surgery, he was forced to engage in lifting and other heavy manual labor. Medical aid was denied and medical prescriptions ignored. The extent of his permanent injuries resulting from this treatment remains to be determined.

Another inmate came to the institution with a serious heart condition. Instead of being placed in the infirmary for direct observation and monitoring of his condition, he was placed in one of the cellhouses. He died before receiving medical attention.

Trips to Colorado State Hospital are dependent on the availability of transportation which is controlled by security staff. There is only one motor vehicle available for transferring prisoners to CSH. Medical staff must compete with security staff. As a result, there is a serious backlog of prisoners waiting for general surgery, orthopedic surgery and for treatment by ear, nose and throat specialists. Three to four specialty clinics a week have been cancelled because Department of Corrections security staff did not provide the necessary transportation

to CSH. Moreover, arbitrary rules imposed by prison officials have prevented prisoners from obtaining prompt medical treatment. Even though five prisoners may be scheduled to go to CSH for treatment, if one of those five prisoners is classified as "maximum security," security staff will only permit one prisoner to be transported to CSH that day. As of February 1978 there was a backlog of 212 prisoners waiting for treatment at CSH specialty clinics.[11]

Inmates are entitled to reasonable dental care. Serious dental problems constitute the single most prevalent physical health problem in the institution. Dental problems cause and complicate other physical and psychological ailments. Dental staff and equipment have been insufficient to provide urgent care, though some improvements have been made in recent months. The present inmate per dentist ratio is disproportionate in comparison with other prison systems and precludes proper treatment of dental needs. There is a serious backlog of prisoners awaiting oral surgery and other dental treatment. As of June 1, 1979, neither Colorado State Hospital nor the Department of Corrections had an oral surgeon. In some cases, acute infectious dental conditions have been left untreated or have not been treated in a timely or appropriate fashion. Dental health care at Old Max is well below minimally acceptable standards for dental care, including the June 1, 1978, Draft Federal Standards for Medical Care and Health Services in Corrections, the American Medical Association Standards on Medical and Health Services in Corrections, and the Colorado Dental Association Standards.

"Mental health needs are shunned and ignored as if they were an ugly stepchild of corrections." Plaintiffs' Trial Brief, at 43. A few years ago, the psychology department was abolished. Staff were reclassi-fied as "corrections specialists" and moved over to the medical department. The Administrator of the Medical Department, however, claims "mental health" is not his responsibility. Presently, psychological services are under the Programs Manager and have been renamed the "mental health" department. The prison does not have adequate staff trained in psychology or psychiatry. The entire operating budget for the mental health department for 1978–1979 is less than $500.

In 1978, the Department reported more than 70 incidents of suicide and self-mutilation attempts. Between January 1, 1979 and May 30, 1979, the Department reported more than 21 incidents. The Department's own Five Year Plan issued in February 1978 recognized that "many, if not all of these incidents [involving self-inflicted wounds] could [have been] avoided by placing these inmates in a professionally-administered unit that does not entail the almost total sensory deprivation of cellhouse 3."

The Canon Correctional Facility complex has been without psychiatric coverage for years. A psychiatrist from the Reformatory in Buena Vista comes to Old Max once a month or sometimes once every two months. This "coverage" is inadequate to meet minimally acceptable standards for psychiatric care. The prison has been without a Ph.D. trained psychologist since the fall of 1978. Counseling personnel who are an important adjunct to psychological and psychiatric staff are deficient both in numbers and in qualifications. Until the middle of 1979 there were only two full-time equivalent counseling positions in the mental health department. An additional position was added during the summer, but none of these individuals are licensed as clinicians in the State of Colorado. The department has no civilian support staff. As a result, the counselors on staff spend a disproportionate

11. The backlog problem has been complicated by surgical residents at CSH who pick and choose among procedures and will only do ones that interest them. Their treatment of prisoners is rude and unsympathetic. Uninteresting cases go untreated. One side effect of this is that people waiting for surgical procedures are on pain killers and are becoming addicted. Another is quite understandable hostility which predictably will erupt on some unknowing innocent person at a later time following release. The subsequent crime and victim will be included in the inevitable statistics used to describe recidivism.

amount of time on administrative and clerical work rather than treatment. The mental health department is not even considered a part of the medical department by the institution. It is under the jurisdiction of the Programs Manager.

Staffing deficiencies in the mental health department have been brought to the attention of the Department for years and have been disregarded. In February 1977, the University of Colorado Department of Preventive Medicine and Health Services conducted an on-site evaluation of health services and found critical shortages in mental health department staffing. The evaluation recommended significant staffing increases. To date, these recommendations have not been implemented.

In 1978, the mental health department at Old Max requested an additional psychologist to work with severely disturbed prisoners in cellhouse 3. The legislature approved the position, but the Department of Corrections used the money to hire a personnel officer instead.

In May 1978, Steve Bloom, the former Department Director of Psychology and Diagnostic Services made a "conservative" estimate of current mental health needs of prisoners at Colorado State Penitentiary and found that there was a need for at least 12 full-time mental health clinicians who could devote 75% of their time to treatment activities as opposed to administrative training or supervisory functions. His recommendations have not been heeded.

At best, the Department's limited mental health staff operates on a crisis intervention basis with little or no opportunity for either adequate planning or implementation of treatment programs. The mental health staff have an excessive caseload. They do not receive consistent information from the Diagnostic Unit identifying prisoners in need of psychological treatment. Even if recommended, the staff is inadequate to provide treatment to those in need. Individual and group counseling are severely restricted. Psychiatric treatment is practically nonexistent. There is a large waiting list of prisoners in need of treatment. The

monitoring of the effects of psychotropic medication on individual inmates is lamentably inadequate.

The physical facilities in which mentally disturbed prisoners are housed are as inadequate as the staff available to treat them. Acutely psychotic patients, suicidal patients, patients on psychotropic medication and mentally retarded prisoners are housed in the most restrictive cellhouse at Old Max (cellhouse 3) along with prisoners in administrative and punitive segregation who are being punished for disciplinary violations. Cellhouse 3 has no resemblance to a treatment ward; it is a segregation unit with small cells that are filthy, inadequately lighted, improperly ventilated and infested with vermin and rodents. Prisoners are locked in their cells over 22 hours a day. No treatment or activities are provided. Prisoners are never allowed out of their cells except for a brief time every other day for showers or yard time. Such restrictive confinement causes irreparable disabilities.

The Department's own Five Year Plan issued in February 1978 recognized that many of the present cellhouse 3 population do not require the maximum security, highly restrictive regimen typical of cellhouse 3. These individuals require a professional staff experienced in social and psychological needs of disturbed patients. Frequently, because of the low level of individual attention devoted to mentally ill prisoners and because of the high level of sensory deprivation that results from housing individuals in a total isolation environment, prisoners at Old Max are compelled to make suicidal or self-mutilatory gestures in order to attract help. Yet bed space in the infirmary is under utilized because of a lack of staff.

In the summer of 1978, there was a rash of suicides and suicidal attempts by prisoners housed in cellhouse 3. Between April 25 and June 18, 1978 alone, four prisoners in cellhouse 3 succeeded in killing themselves. After these fatalities, the Department set up a special inter-agency crisis committee to address the suicide situation in cellhouse 3. The committee made numerous recommendations which have been ignored.

The Interagency Crisis Committee found that staffing was totally inadequate to ensure the life and safety of prisoners in cellhouse 3. Moreover, the committee found that the mixture of prisoners in cellhouse 3 is "basically detrimental." The committee reported that:

The sociopath is found to take brutal advantage of those he can intimidate who have inadequate personalities, low ego images or standard social ethics. There needs to be further separation in relationship to security.

The committee's findings brought the reality of the situation in cellhouse 3 to the attention of defendants Ault and Wilson, yet the situation in cellhouse 3 is as dangerous today as it was a year and a half ago. One resident of cellhouse 3 has never been convicted of a crime. He was deposited there by the State Hospital because he is dangerous. He is also insane and in desperate need of treatment.

In June 1978, the Special Interagency Crisis Committee recommended that the Department seek funding in fiscal 1978–79 for:

—a ward in the infirmary for acute mental health problems.

—one or more treatment units within the Department for long-term psychotics and inadequate offenders and staff it accordingly.

—increased staffing in Cell House 3 to provide at least 1 staff per tier during the day and evening shifts, 3 F.T.E. program/counseling staff per shift, and 1 psychiatric technician per shift.

The Department of Corrections never attempted to implement these recommendations.

Although the Colorado State Hospital has a forensic unit, mental health staff at Old Max have had great difficulty finding bed space for prisoners at Old Max with acute psychiatric problems. CSH makes only five beds available for prisoners to participate in long-term treatment programs. As a result, prisoners with acute mental problems have had to wait as long as 1½ months for space to become available. Even when prisoners are transferred to CSH, they are only there a short time before being returned to the same intolerable conditions at the prison without sufficient follow-up care.

CSH transfers nonconvicted state hospital patients to Old Max. These patients are housed in cellhouse 3 along with the most dangerous and severely disturbed prisoners in the system and have virtually no access to psychiatric care. In 1973 and 1974 the United States Civil Rights Commission and the Colorado State Grand Jury found that there was a serious problem with housing CSH patients at Old Max because of the lack of opportunity to provide consistent medical and psychiatric assistance to such patients. Despite their findings, this situation has not changed.

The number of drug and alcohol treatment programs available is insufficient to meet the need for the number of prisoners who enter Old Max with drug and alcohol problems and medical needs. The Department has been aware of the enormity and severity of this problem for years. In 1974 and 1975, studies revealed that 68% of prisoners at Colorado State Penitentiary had drug and alcohol problems. Recent data from the Diagnostic Center reveal that 90% of incoming prisoners tested for substance abuse had significant involvement with alcohol and drugs. The Colorado state legislature has expressly stated that "alcoholism and intoxication are matters of statewide concern" and that "the social and economic costs and the waste of human resources caused by alcohol abuse and alcoholism are massive, tragic and no longer acceptable." C.R.S., § 25–1–301(1), (2) (1973). The legislature expressly directed the Division of Alcohol and Drug Abuse of the Department of Health to cooperate with the Department of Corrections in establishing and conducting programs for the prevention of alcoholism and treatment of alcoholics and intoxicated persons in appropriate agencies and institutions. C.R.S., § 25–1–304 (1978). Nonetheless, the evidence reveals that Colorado prisoners are not even given adequate opportunity to correct drug and alcohol problems. The few programs which exist

at Old Max involve only a smidgen of prisoners. Prisoner self-help programs have been disallowed or severely restricted in number by prison officials. Services by outside organizations have been discontinued.

The Department of Corrections has ignored the opportunity to transfer prisoners from Old Max to the Drug Treatment Center at Colorado State Hospital. In the past two years, the Department of Corrections has approved transfer of only one prisoner from Old Max for this program. Even then it took the mental health administrator nine months to get the classification board to approve the transfer and several more months to effectuate it. Similarly, Federal agencies have approved grants to the Colorado Department of Corrections for drug and alcohol treatment only to have the State of Colorado refuse to appropriate the minimal necessary matching funds.

Defendants' disregard of the need of prisoners for drug and alcohol treatment contributes to the totality of conditions which make degeneration probable and self-improvement unlikely. In fact, two thirds of Colorado inmates paroled in recent years had drug or alcohol problems when they were released.

### CLASSIFICATION

As Judge Johnson stated in *Pugh v. Locke*, 406 F.Supp. at 324, "the degree to which [the lack of a working classification system] impedes the attainment of any proper objectives of a penal system cannot be overstated." Colorado has recognized this importance by requiring by statute that the Department of Corrections maintain a diagnostic program which will provide that each prisoner be assigned

to a correctional institution which has the type of security and, to the extent possible, appropriate programs of education, employment, and treatment available, which are designed to accomplish maximum rehabilitation . . . and to prepare an offender for placement into as productive an employment as possible following imprisonment. C.R.S., § 17–40–102 (1978).

The classification system used in Colorado results in overclassification of prisoners both to and within the maximum security facility. In spite of the clear mandate of the Department of Corrections' policies that no prisoner should be housed in a more secure status than security risk and program needs dictate, at the present time, at least ⅔ of the prisoners housed at the maximum security facility do not require maximum security housing. According to Department data, on April 30, 1979, only 60 of the 586 prisoners housed at the maximum security facility with a maximum security classification should have been so classified. The same data reveals that 137 prisoners at Old Max should have been classified for minimum security.

Because of a continuing lack of bedspace, even those prisoners appropriately classified as less than maximum security are often either housed for lengthy periods of time under maximum security conditions at the Diagnostic Unit or are sent "behind the walls" of Old Max. A number of those who should have been sent to the medium security institution have been sent to Old Max. In addition, over 60 young men who should have been sent to the Reformatory also were sent to Old Max.

In fiscal 1977–78, the Department of Corrections received a grant from the Law Enforcement Assistance Administration for a casework development reporting system which allowed for computerized scoring and analysis of diagnostic tests. During that same year, the legislature by statute required that a "Colorado Diagnostic Program" be centralized at the Diagnostic Unit adjacent to the old maximum security facility at Canon City. C.R.S., §§ 16–11–308 (1979), 17–40–102 (1978). The Department contracted with Herbert Eber and Psychological Resources, Inc., of Atlanta, Georgia, to develop a computerized classification program (Psychodiagnostic and Risk Assessment System) and an information storage and retrieval system (VISOR). In March 1978, for the first time in Colorado history, the Department promulgated a set of de-

partmental criteria for classification. In spite of the expenditure of federal funds and the availability of fairly impressive computer capabilities, the effects of this recent movement have not corrected the many long existing classification problems.

A person's first housing after being sentenced to prison is in one of 118 cells in the Diagnostic Unit at Canon City. Although the diagnostic process is supposed to take nine days to complete, incoming prisoners stay at the Diagnostic Unit an average of four to five weeks with some staying as long as three months. During that time, the prisoners generally stay locked in their small inadequately lit and windowless cells in the three-tiered cellblock. They are allowed out of their cells for meals, a maximum of one hour of exercise per day, and shower and formal diagnostic requirements. Visitation and canteen services to prisoners in the unit were banned in 1978. In the past six months these have been restored to a limited extent. Prisoners are not allowed to visit the law library. They are allotted a total of two stamps a week for two weeks to correspond. The one television set that was at one time available has been removed. The only reason asserted for the existence of these conditions is a lack of staff.

During the time the prisoner is at the Diagnostic Unit, he is given a battery of tests, including three personality inventory tests. The test results are computerized and serve as the core of the automated system for classification. The results are derived by the use of equations devised by Dr. Eber which give various weights to certain answers given to certain questions on two of the personality inventory tests. A narrative print-out statement of the results is produced which purports to predict for classification use the future behavior of the prisoner including violence, escapes, management problems and recidivism. The predictions become a part of the prisoner's permanent file and are available not only to the "programmers" at the Diagnostic Unit (none of whom are licensed clinical psychol-ogists or have adequate training in psychometrics) but also to case managers and other nonprofessional staff. They are also furnished to the parole board. It is unclear to what extent these predictions are used to make security designations within correctional facilities (maximum, close, medium, minimum A and B) or to determine facility placement since any and all professional judgment, diagnosis and predictions are subject to absolute veto or modification by security officers.

Dr. Eber's equations are based upon testing done on prisoners and nonprisoners in Georgia and Alabama. No revalidation studies have been done on those equations; and there has been no revalidation or restandardization of the equations utilized in making predictive judgments of the future behavior of Colorado inmates. Dr. Eber admits that the predictions made are so poor that they should be used for classification only as initial classification by trained and experienced staff when there is no other good evidence available, and future classification instead based on actual behavior prior to and during the first several months of incarceration. Such predictions should only be used, if at all, by trained clinical psychologists for mental health diagnosis and/or care. They certainly should not be sent to the parole board.

Unfortunately, the predictions are not utilized by trained personnel for legitimate purposes. The criteria listed in the Policy Statement are vague and lack definition. For example, one must be classified maximum if the escape risk potential is "high" or the inmate has "serious adjustment" problems whereas one should be in close custody if the escape risk is "moderate" and there are "adjustment" problems.[12] (DOC Reg. 202–1) Further, there are serious overclassifications caused by the arbitrarily chosen categorization of people who should be classified "maximum security." For example, neither a need for protection nor a likelihood for self-harm is a rational basis for a blanket requirement of maximum security treatment. Rather, all data concern-

---

12. One can be classified medium security if there are "minor adjustment" problems.

ing each inmate should be viewed in its entirety and considered on an individual basis by trained staff with adequate behavioral information.

Irrational use of bars are even more serious problems for the programmers at Diagnostic Unit in making facility assignments. Under present policy, for example, *all* persons with more than six years remaining for parole eligibility and *all* persons with a class I misconduct report (any assault or "deviate" sexual misconduct) within the past year are to be assigned to the maximum security facility. (DOC Reg. 202–1) (Code for Penal Discipline) Obviously, such factors should be taken into account along with other factors in a rational classification scheme. They should not be prohibitions which render all other data meaningless.

Programmers at the Diagnostic Unit also suffer from a lack of information. In thirty per cent of the cases, they do not receive statutorily required presentencing reports from local officials. They are significantly understaffed and cannot spend adequate time interviewing inmates. Because of staff shortages and overwork, they have been forced to discontinue the past practice of contacting people in the community to gain background information. Finally, in spite of the dictates of the Department's own 1977 Master Plan, initial classification decisions are made by only one programmer and not by an institutional team. There is no system for monitoring decisions of the five programmers to assure that similar criteria are being applied in making classifications. (1977 Corrections Master Plan, 5.25).

With all the crippling deficiencies in the classification process at the Diagnostic Unit, the process breaks down further when the prisoner is sent to the maximum security facility with his security designation and a statement of his "general needs" that may have been identified.[13] The program staff at the Diagnostic Unit has no further participation in individual inmate program decisions. Further, the diagnostic packet which is prepared at the Diagnostic Unit is usually ignored at the maximum security facility. Many decision-makers are not provided relevant information from the packet. The Department has made no follow-up studies to determine the correlation between diagnostic recommendations and actual placement. The lack of coordination of the Diagnostic Unit with other components of the Department which was noted in the 1977 Master Plan still exists. (Master Plan p. 5.15) The plan stated that in order to carry out effective classification decisions, the classification committee for each institution should be composed of three people, the institution's program manager, a representative of the security staff and of the professionally trained personnel who perform counseling and casework activity. (Master Plan p. 5.24) The dire results that can occur when one person dominates a fragmented and unverified classification system is amply illustrated by the fact that the Chief Classification Officer at the maximum security prison until November 20, 1978, made, in the words of Dr. Eber, "grossly inappropriate classifications," often with absolutely no factual support for his decisions.[14]

The Master Plan and recommended classification practices have yet to be implemented. Job, program and housing decisions are relegated to separate and diverse components of the prison system and not to centralized and appropriately staffed classification teams. Mark McKinna, a former guard with a social services degree, is the chairman of the Classification Board which determines security classification, meritorious good time, and assignment to cellhouses

---

13. The best trained classification personnel are at the Diagnostic Unit. Their past practice of structuring specific programs for prisoners was discontinued because the facilities were unable to meet the program demands. Now facility personnel do specific need classification based upon space available.

14. Some of those persons who were "grossly inappropriately classified" have still not had their classification adjusted and the inappropriate classification designations are still in the prisoner files.

4 and 5. The other two members of the board are selected by McKinna based upon who is available at the time. No effort has been made to bring about maximum staff participation in the process. Major Johnson, the Security Manager, and Captain Gindro, the Intelligence Officer, are often the other two members, particularly when decisions relating to security classification are to be made. A correlation between the composition of the board and the continuing and admitted overclassification at the maximum security facility is apparent.

Curiously, housing assignments within the facility and job assignments are not under the control of McKinna or the Classification Board. Instead, Major Matthews makes housing assignments. The various job supervisors, with total discretion and no departmental criteria, hire prisoners for the few jobs that are available. Inmates are hired on a referral basis from other inmates. No coordinated effort is made to use job assignments as a rehabilitative tool. There is no system in effect to assure equitable distribution of available jobs. Disparate hiring on a racial and ethnic basis is obvious and statistically demonstrable.

The classification process is completely ineffectual. There aren't enough case managers. The few who are employed lack professional training in counseling and other casework activities. Case managers do not have regular and frequent communication with prisoners and do not aid them in obtaining appropriate jobs, housing and program assignments. Case managers have no clout and no means of enforcing their decisions.

No caseworker position existed until December 1978, at which time, five guards with no special education or training were selected to be case managers. Even if they were adequately educated and trained, they would be unable to handle their expected case loads of 185 or more prisoners. They have no support staff and spend an inordinate amount of time doing clerical work. They share inadequate office space with no space for private interviews or counseling. The present case managers do not sit on classification boards; they have no participation in classification decisions, seldom see their clients and cannot hope to comply with requirements for regular program reviews. Some prisoners are not even aware of their case manager's existence.

## ACCESS

■ Access to human contact is an essential human need. Within the prison setting, questions concerning access generally involve visitation, correspondence and assertion of justiciable rights.

a. Visitation

■ Visitation with family and friends involves fundamental rights of association, privacy, and liberty which are protected by the First, Ninth and Fourteenth Amendments to the Constitution of the United States,[15] yet Section One of the prison regulations until recently gave prison staff complete discretion to revoke or suspend temporarily all visiting privileges. Such regulations are contrary to modern correctional standards which require the superintendent to present clear and convincing evidence that visitation jeopardizes the safety and

15. Virtually every statement on visitation from the American Correctional Association Manual to the State Association of Correctional Administrators (1972), every national study (e. g., the National Advisory Commission on Criminal Justice Standards & Goals) and every major textbook on corrections stresses the critical nature of visitation both in terms of the reduction of tension inside the prison and the facilitation of the ultimate rehabilitation of the prisoner by strengthening his ties with the "free world." See A.B.A., "Tentative Draft of Standards Relating to the Legal Status of Prison-

ers," 14 Am.Crim.L.Rev. 502 (Winter 1977); See also A.C.A., Manual of Standards for Adult Correctional Institutions §§ 4210, 4305, 4351 (1977)

Even defendants' Five Year Plan recognizes that the mental agony of family separation is a strong negative factor in the inmate's life and often affects the inmate's participation in otherwise beneficial programs and maintenance of interpersonal relations with staff and other inmates. The inability to communicate privately with a spouse or family member makes the inmate susceptible to decay of family relations.

security of the institution or the visitors before he or his designee can suspend visitation rights. *See* A.C.A. Standard § 4351. A new regulation on visiting was adopted in June 1979. *See* CCF Regulation 301–19. Some criteria and procedures have been developed. There is no indication that the inmate or visitor has any input to the decision or access to any grievance procedure.

Defendants have denied prisoners at Old Max the opportunity for contact visitation. In August 1976, prison officials converted the visiting room at Old Max from contact to non-contact visiting by constructing concrete walls and plastic barriers to separate prisoners from visitors so no touching was possible. No provision was made for contact visitation for those prisoners whose classification and behavior merited open visiting privileges. The regulations adopted in June 1979 restore some contact visiting. A few plastic barriers have been removed, but contact is still very limited.

Every expert witness in this case, including defendants', has testified to the importance of contact visiting and the debilitating effects caused by the denial of contact visitation. The defendants' 1977 Master Plan recognizes that the denial of contact visits has caused increased tension in the prisoner population. Reasonable limits on visitation, adapted to individual circumstances, and decisions to deny open visitation are not based on reliable facts which indicate that an individual prisoner presents an actual threat, e. g., a clear and present danger, to the security of the institution.

Defendants' visitation policies deny prisoners the opportunity to visit with non-relatives; Colorado only permits a prisoner to visit with friends if the prisoner has no relatives in the state and then allows the prisoner to have only three visitors on an approved list.[16] Moreover, defendants' visiting policies and procedures limit the days on which prisoners may visit. Prisoners in different classifications are allowed visits only on particular days of the week. There are a number of days when visits are not allowed at all.

b. Correspondence

Regulations at Old Max permit prison staff to read and inspect all incoming and outgoing general mail and to censor or exclude mail according to certain criteria. Books, newspapers and periodicals may be ordered and paid for by inmates or outside correspondents, but must come directly from the publisher or an established vendor or distributor. Outgoing legal mail can only be opened in "extreme emergency cases, and only when probable cause exists to believe contraband [or improper communications] exists . . . ." CCF Regulation 302–18(6). Incoming legal mail is opened and inspected for contraband in the presence of the inmate.

One policy at the prison refuses to deliver mail in any language other than English, even though one-third of the prison population is Hispanic. Numerous prisoners lack speaking, reading and writing skills in English, as do many of their correspondents.[17]

Defendants also limit receipt of mail, when in the judgment of the mental health staff and the particular inmate's caseworker, certain correspondence "would cause severe emotional disturbance to the [receiving] inmate." CCF Regulation 302–18(7)(b). The problem here is that there are no psychiatrists or even licensed clinicians on the Canon Correctional Facility staff, and the case management system is so inadequate as to be virtually non-existent.

c. Access to the Courts

The law libraries at Old Max fall below any known acceptable standard. The general population law library has approximately half of the law volumes recommended by the American Association of

---

16. A.B.A. Draft Standard § 6.2(c) provides that prisoners should be able to receive any visitor not previously excluded for good cause.

17. The Federal Bureau of Prisons recently deleted from their proposed correspondence regulations the requirement that all inmates write their letters in English. 44 F.R. 35957 (June 19, 1979).

Law Libraries Committee on Law Library Services to Prisoners. The library consists mostly of outdated advance sheets, pocket parts and discards from various sources. The small libraries which have been provided for those in protective custody in cellhouse 7 and those in segregation in cellhouse 3 have fewer materials and are even more inadequate. There is no civilian staff with paralegal or legal training to supervise the libraries or assist inmates with research. A recent evaluation of the prison law libraries recommended that at least two full-time employees be hired to supervise the libraries on a day to day basis.

The general population law library is open five days a week from 9:00 to 11:30 a. m., 12:30 to 3:30 p. m., and, after the evening count, from 7:00 to 9:00 p. m. Only three inmates are allowed in the library during any one of these periods. The smaller libraries in cellhouses 3 and 7 are open for two or three hours in the morning, and again for a similar number of hours in the afternoon. Only one inmate is allowed in each of these libraries at any one time. Sign-up lists for access to the libraries are on a first-come, first-served basis, but inmates with pending litigation have first priority.

No law materials can be "checked out" or taken from the libraries, and photocopies cost fifteen cents a page. The limited number of typewriters are in various states of disrepair, and supplies of paper, carbon and other needed items are sporadic and often inadequate.

### CONCLUSIONS OF LAW

■ There is no dispute that "the Constitution does not stop at the prison gate, but rather inures to the benefit of all, even to those citizens behind prison walls." *Battle v. Anderson*, 447 F.Supp. 516, 524 (E.D.Okl. 1977), aff'd, 564 F.2d 388 (10th Cir. 1977). See *Bell v. Wolfish*, 441 U.S. at 545, 99 S.Ct. at 1877, 60 L.Ed.2d at 472; *Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct.

2963, 41 L.Ed.2d 935 (1974); and *Cruz v. Beto*, 405 U.S. at 321, 92 S.Ct. 1079. At the same time, " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' " *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) (quoting *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948)).[18]

■ The primary source of plaintiffs' constitutional attacks on the conditions of confinement at the Canon Correctional Facility is the Eighth Amendment's prohibition of cruel and unusual punishment, applicable to Colorado and all other states by way of the Fourteenth Amendment. See *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). The scope of the Eighth Amendment "proscribes more than physically barbarous punishments," and requires that a government "provide . . . care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 102–03, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). Challenges to conditions of prison confinement have been recognized as valid constitutional claims, as such conditions may constitute cruel and unusual punishment. See, e. g., *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251; *Wilwording v. Swenson*, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418; *Battle v. Anderson*, 376 F.Supp. 402 (E.D.Okl. 1974), subsequent opinion, 447 F.Supp. 516 (E.D.Okl.1977), aff'd, 564 F.2d 388 (10th Cir. 1977); *Holt v. Hutto*, 363 F.Supp. 194 (E.D. Ark.1973), aff'd in relevant part, rev'd in part and remanded sub nom. *Finney v. Arkansas Board of Corrections*, 505 F.2d 194 (8th Cir. 1974), on remand, *Finney v. Hutto*, 410 F.Supp. 251 (E.D.Ark.1976), aff'd, 548 F.2d 740 (8th Cir. 1977), aff'd, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Newman v. Alabama*, 349 F.Supp. 278 (M.D.Ala. 1972), aff'd in relevant part, 503 F.2d 1320

---

**18.** The Supreme Court recognized four functions of a corrections system in *Pell v. Procunier*, 417 U.S. 817, 822–23, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974): deterrence, confinement of criminal offenders, rehabilitation, and internal security.

(5th Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1974).[19]

In *Clappier v. Flynn*, 605 F.2d 519, 533–34 (10th Cir. 1979), the Tenth Circuit recently addressed the issues of liability under Section 1983 for omissions or failures to act, which characterize many, if not most, of the problems which plaintiffs have suffered at the Canon Correctional Facility.

> [T]he area of concern in terms of a Sec. 1983 liability involving an allegation of cruel and unusual punishment *relating to a claimed omission* requires proof of exceptional circumstances and conduct so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to basic fairness. Such, in our view, is consistent with those opinions interpreting the term 'cruel and unusual punishment' forbidden by the United States Constitution as meaning something inhuman, barbarous, violative of

basic concepts of decency and so foul as to shock the court's sensibilities. *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910); . . .

> . . . . .

In *Battle v. Anderson*, 376 F.Supp. 402 (E.D.Okl.1974); *aff'd*, . . ., the District Court stated that while the Eighth Amendment does not have fixed, settled and definite limits, still 'cruel and unusual punishment' exists if prisoners are maintained in a manner fairly characterized as foul, inhuman and violative of basic concepts of human decency. [Emphasis in the original.]

Plaintiffs have shown that grossly inadequate conditions exist at the Canon Correctional Facility.[20]

**19.** Defendants at several points of this litigation have argued that *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), requires that a condition or practice first be found to constitute "punishment" before it can then be determined whether it is "cruel and unusual." The issue was central in *Bell v. Wolfish* because most of the persons confined at the Metropolitan Correctional Center were federal pretrial detainees who had been charged with crimes but not yet convicted. While the parties conceded that such persons can be legitimately confined by a government prior to a determination of their guilt or innocence, *id.*, 99 S.Ct. at 1865, 60 L.Ed.2d at 458, these persons could not be subjected to punishment. The question, then, as framed by Justice Rehnquist for the majority, was whether conditions at the MCC "amount[ed] to punishment of the detainee" in violation of Fifth Amendment due process. *Id.*, 99 S.Ct. at 1872, 60 L.Ed.2d at 466. For a convicted inmate, on the other hand, confinement in a penal institution *is* punishment, and it is the execution of that confinement which is subject to the Eighth Amendment's prohibition of cruel and unusual punishment. The Supreme Court has recognized that inadequate attention to prisoners' medical needs may constitute cruel and unusual punishment, even though I assume, with some misgivings, that medical care is not intended as punishment. *See Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

**20.** As the Court of Appeals recognized in *Clappier*, trial courts "[have been] provided scant guidance in this difficult area." *Clappier v.*

*Flynn*, 605 F.2d 519, 533 (10th Cir. 1979). For a discussion of the various standards and approaches that lower courts have taken, *see* Robbins, *Federalism, State Prison Reform, and Evolving Standards of Human Decency: On Guessing, Stressing, and Redressing Constitutional Rights*, 26 Kan.L.Rev. 551 (1978). In *Baker v. McCollan*, 443 U.S. 137, 139, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433, 439 (1979), the Supreme Court noted the difficulty of resolving the scope of liability under Section 1983:

> [T]he question whether an allegation of simple negligence is sufficient to state a cause of action under § 1983 is more elusive than it appears at first blush. It may well not be susceptible of a uniform answer across the entire spectrum of conceivable constitutional violations which might be the subject of a § 1983 action. In any event, before the relationship between the defendant's state of mind and his liability under § 1983 can be meaningfully explored, it is necessary to isolate the precise constitutional violation with which he is charged.

The "precise constitutional violation" at issue here is whether conditions of confinement at the Canon Correctional Facility are cruel and unusual punishment in violation of the Eighth Amendment. While the Supreme Court, in according prison administrators deference, has used such language as "deliberate indifference," *Estelle v. Gamble*, 429 U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and "exaggerated response," *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), I am in complete agreement with Justice Stevens' dissenting opinion in *Estelle v. Gamble*,

## PHYSICAL ENVIRONMENT

 The Supreme Court has recognized a matrix for determining whether certain conditions of confinement are constitutionally unacceptable. *See Bell v. Wolfish*, 99 S.Ct. at 1875–76, 60 L.Ed.2d at 470–71; *Hutto v. Finney*, 437 U.S. at 685–87, 98 S.Ct. 2565. On one side of the matrix are conditions of confinement; on the other are various durations of confinement. The shorter the duration of confinement, the more spartan are the allowable conditions. As the Court said in *Hutto v. Finney*, "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months." *Id.* at 686–87, 98 S.Ct. at 2572. At the Canon Correctional Facility, inmates are placed in substandard living conditions for a variety of reasons— because they are "transitional workers," or in alleged need of protective custody, or simply because there is no room at lesser security prisons, none of which are justified as short-term disciplinary measures.[21] Those conditions are instead the day to day character of confinement at the Canon Correctional Facility.

 In *Battle v. Anderson*, the Tenth Circuit affirmed an order which adopted the American Public Health Association standard of 60 square feet as the constitutional minimum for cells in which inmates of a general population are routinely confined. 564 F.2d at 395. Cells in cellhouses 1 and 7 are almost half this size, and grossly inadequate under any standard. Additionally, the 60 square foot standard is premised on the assumption that inmates are outside of their cells for a substantial part of the day, engaging in either vocational, educational or recreational activities. The evidence in this case shows, however, that a substantial number of prisoners at Old Max, particularly those in cellhouse 3, are locked in their cells from 20 to 23 hours a day. For persons confined for such long periods of time, the American Correction Association standards call for 80 square feet, and I

429 U.S. at 108–17, 97 S.Ct. at 293–97, 50 L.Ed.2d at 263–68 (Stevens, J., dissenting), that, if such language "is meant to indicate that intent is a necessary part of an Eighth Amendment violation, I disagree. If a State elects to impose imprisonment as a punishment for crime, I believe it has an obligation to provide the persons in its custody with a health care system which meets minimal standards of adequacy." *Id.* at 116, 97 S.Ct. at 297 n. 13, 50 L.Ed.2d at 267 n. 13. The question under the Eighth Amendment is whether a form of punishment is cruel and unusual in its execution. When there has been a failure on the part of an institution as a whole to meet constitutional minima and that failure is shown by substantial evidence, there has been a violation of the Eighth Amendment. As Justice Stevens said in *Estelle*,

Subjective motivation may well determine what, if any, remedy is appropriate against a particular defendant. However, whether the constitutional standard has been violated should turn on the character of the punishment rather than the motivation of the individual who inflicted it. Whether the conditions in Andersonville were the product of design, negligence, or mere poverty, they were cruel and inhuman.

*Id.* at 116–117, 97 S.Ct. at 297, 50 L.Ed.2d at 267–68 (footnote omitted). (Similar reasoning is implicit in the decisions of the trial court and court of appeals in *Battle v. Anderson*. The

lower court said that neither good will nor lack of financing was a defense "to a failure to provide minimum constitutional standards," 447 F.Supp. at 526, and the court of appeals said that certain otherwise reasonable fears and "significant progress in correcting many of the abuses and/or providing for new or additional facilities" was likewise not an excuse for continuing constitutional violations. 564 F.2d at 403.) Still, while my heart is with Justice Stevens, jurisprudence is with those decisions endorsed by a majority of the court. Even so, as set out in this opinion, I find that the conditions of confinement at the Canon Correctional Facility meet all tests by all known measures of proof. As shown by substantial evidence, these conditions shock the conscience, are incompatible with evolving standards of decency, involve unnecessary and wanton infliction of pain, and evidence both deliberate indifference to the prisoners' protected interests and "circumstances and conduct so grossly incompetent, inadequate or excessive as . . . to be intolerable to basic fairness." *Clappier v. Flynn*, 605 F.2d at 533.

21. In fact, each of these reasons is offered as an excuse for some of the major problems evidenced in this case: lack of jobs, inadequate security, and overcrowding of the state's correctional facilities.

find that to be the constitutional minimum for any prisoner confined in his cell for 20 or more hours a day.[22]

■ In addition to physical space, courts have considered the totality of environmental health and safety conditions in determining whether that environment is constitutionally acceptable. *See, e. g., Williams v. Edwards,* 547 F.2d 1206 (5th Cir. 1977); *Palmigiano v. Garrahy,* 443 F.Supp. 956 (D.R.I.1977), *appeal dismissed,* 599 F.2d 17 (1st Cir. 1979); *Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976), *aff'd and remanded sub nom., Newman v. Alabama,* 559 F.2d 283 (5th Cir. 1977), *cert. denied in relevant part sub nom., Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *Battle v. Anderson,* 376 F.Supp. 402 (E.D.Okl. 1974), *subsequent opinion,* 447 F.Supp. 516 (1977), *aff'd,* 564 F.2d 388 (10th Cir. 1977); *Gates v. Collier,* 349 F.Supp. 881 (N.D.Miss. 1972), *aff'd,* 501 F.2d 1291 (5th Cir. 1974); and *Holt v. Sarver,* 309 F.Supp. 362 (E.D. Ark.1970), *aff'd,* 442 F.2d 304 (8th Cir. 1971). The evidence shows that the conditions at the Canon Correctional Facility—in virtually all areas except the new administration building[23]—regarding hygiene and sanitation, heat, ventilation, weather-proofing, fire protection, lighting and plumbing have long been serious problems, and that many are outright dangers to health and safety. The physical facilities are in such a state of age, disrepair and obsolescence that numerous experts and officials, including defendants, have concluded that the massive renovation that would be required to make the Canon Correctional Facility habitable is both physically and economically impractical. The conditions are grossly inadequate and constitutionally impermissible.

## PHYSICAL SAFETY

■ In *Woodhous v. Commonwealth of Virginia,* 487 F.2d 889, 890 (4th Cir. 1973), the Fourth Circuit said that "[a] prisoner has a right, secured by the Eighth and Fourteenth Amendments, to be reasonably protected from constant threat of violence and sexual assault by his fellow inmates, and he need not wait until he is actually assaulted to obtain relief." Other courts have agreed. *See Williams v. Edwards,* 547 F.2d at 1213; *Palmigiano v. Garrahy,* 443 F.Supp. at 980; and *Pugh v. Locke,* 406 F.Supp. at 329–30.[24] While violence at Old

---

**22.** Even with regard to the lower requirement for inmates outside their cells for substantial periods of time, the trial court in *Battle* recognized that a number of accepted and approved standards require significantly greater space than the 60 square feet which it adopted. *See* 447 F.Supp. at 525. In addition, I emphasize that these standards are not necessarily applicable to short-term disciplinary confinement. As I stated above, the conditions addressed here are the general character of confinement even for those who have not been charged with any misconduct.

The conditions at the Canon Correctional Facility stand in stark contrast to those at the Metropolitan Correctional Center which was the subject of the litigation leading up to *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In its decision the Supreme Court remarked:

The MCC differs markedly from the familiar image of a jail; there are no barred cells, dank, colorless corridors, or clanging steel gates. [Constructed in 1975,] [i]t was intended to include the most advanced and innovative features of modern design of detention facilities. As the Court of Appeals stated: '[I]t represented the architectural embodiment of the best and most progressive peno-

logical planning.' 573 F.2d at 121. The key design element of the 12-story structure is the 'modular' or 'unit' concept, whereby each floor designed to house inmates has one or two largely self-contained residential units that replace the traditional cellblock jail construction. Each unit in turn has several clusters or corridors of private rooms or dormitories radiating from a central 2-story 'multipurpose' or common room, to which each inmate has free access approximately 16 hours a day.

*Id.,* 99 S.Ct. at 1866–67, 60 L.Ed.2d at 459–60. In addition to the relatively short seven or eight hour periods during which prisoners or detainees were required to remain in their cells, "50% of *all* MCC inmates spent less than 30 days at the facility . . . [and], of the unsentenced detainees, over half spent less than 10 days at the MCC [and] three quarters were released within a month . . . ." *Id.,* 99 S.Ct. at 1866 n. 3, 60 L.Ed.2d at 549 n. 3.

**23.** This includes cellhouses, common and program areas, and kitchen facilities.

**24.** The Colorado Court of Appeals has recognized the state's duty to assure inmate safety and has permitted prisoners who have fled

Max has been significantly reduced, the threat of occurrence is omnipresent. The random design and construction of Old Max has caused a large number of blind spots where violence and other illicit activities can go on completely unobserved. Four reports have concluded that the physical layout of the prison makes it virtually impossible to provide safety.[25]

■ No matter what physical changes are made, the grossly inadequate staff could never cure the problem. The staff which does exist is largely preoccupied with self-protection and maintaining control of the prison. While various reports have recommended substantial increases in staffing, security staff at the Canon Correctional Facility actually decreased in fiscal year 1978–79. While prison security is not the only goal, it is a central one, *Pell v. Procunier*, 417 U.S. at 823, 94 S.Ct. 2800, and effective programs cannot be implemented except in an environment in which both staff and inmates are reasonably secure. The lack of safety at Old Max deprives prisoners of one right and prevents the fulfillment of others.

### IDLENESS

■ While there is no constitutional right to rehabilitation, the law of this circuit is clear that the Eighth Amendment protects an inmate "from an environment where degeneration is probable and self-improvement unlikely because of the conditions existing which inflict needless suffering, whether physical or mental." *Battle v. Anderson*, 564 F.2d at 403.[26] Idleness at the Canon Correctional Facility is pervasive, and "[t]he sad truth is that Colorado is now

operating its maximum security prison by locking down prisoners for substantial periods of time in 2 of its 3 major cellblocks (cellhouses 3 and 7)." Plaintiffs' Trial Brief, at 25. In addition, a 1973 American Correctional Association report found that idleness was responsible for more problems at Old Max than any other factor. Rather than improving, idleness at Old Max has worsened progressively. Prison industries have been discontinued, educational programs cut back, and other constructive activities, such as discussion or self-help groups, limited. I cannot, and will not, "second guess" the prison administrators in trying to say which of these individual decisions might have been unjustified. The fact is that the overall effect is to create conditions of idleness and lockdown that make degeneration likely and self-improvement impossible.

■ I have stated elsewhere, and I will hazard saying it again, that the above conditions are not being imposed as a matter of short-term disciplinary action.[27] Instead, the system at Old Max imposes its own form of Catch-22 on a vast number of the inmate population. "Transitional workers" are inmates who are eligible for jobs but are idle because not enough jobs are available. As a result, they spend up to 20 hours a day in their cells and cannot participate in various other activities because they are not workers. They are not workers only because the prison does not provide jobs.[28]

The same situation is true of inmates in protective custody: they are there because confinement in the general population would be unsafe, not because they are oth-

from Canon City, after allegedly being beaten and raped, to raise the state's failure to protect as a defense to the crime of escape. *See Colorado v. Trujillo*, Colo.App., 586 P.2d 235 (1978).

**25.** While the certified plaintiff class only includes inmates at the Canon Correctional Facility, the prison staff also has a very real and legitimate interest in their own safety, which is likewise ill-served by the prison's condition.

**26.** The Supreme Court has said that a "paramount objective of the corrections system is the rehabilitation of those committed to its cus-

tody." *Pell v. Procunier*, 417 U.S. at 823, 94 S.Ct. at 2804.

**27.** Of course, disciplinary confinement is also subject to constitutional limitations. *See, e. g., Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Gregory v. Wyse*, 512 F.2d 378 (10th Cir. 1975); *Battle v. Anderson*, 376 F.Supp. at 422, 423–24.

**28.** In addition, because they are not workers, they cannot earn statutory good time credit. *See* C.R.S., § 17–20–107 (1973).

erwise ineligible to participate in productive activities. Courts have recognized that where the prison system itself has

> created the conditions that necessitate the widespread use of protective custody, where the totality of conditions of protective custody violate the Eighth Amendment, and where the restrictions complained of amount to additional punishment for which no penological explanation is offered, the additional restrictions are offensive to due process and equal protection and must be enjoined.

*Palmigiano v. Garrahy*, 443 F.Supp. at 982 (citations omitted).

Finally, the same applies to those inmates who are in administrative segregation in cellhouse 3 not as punishment but because of special management problems. Perhaps a number of those inmates should not be at the Canon Correctional Facility at all,[29] but there is no legitimate reason for their categorical exclusion from productive activity.

■ Colorado has provided by statute that "[e]very able-bodied offender shall be put to and kept at the work most suitable to his capacity and most advantageous to the people of this state." C.R.S., § 17–20–117 (1978). *Also see* C.R.S., § 17–20–115 (1978). In the legislative declaration of the Correctional Industries Act, the general assembly has stated:

> The general assembly hereby finds and declares that the means now provided for the employment of offenders are inadequate to allow a forty-hour-week work assignment for all able-bodied offenders and for correctional industries programs to be operated on a financially profitable basis. Therefore, it is the intent of the general assembly in this article to:

(a) Create a division of correctional industries . . . which assumes responsibility for training offenders in general work habits, work skills, and specific training skills that increase their employment prospects when released;

(b) Develop industries that provide forty hours of work activity each week for all able-bodied offenders; [and]

(c) Provide an environment for the operation of correctional industries that closely resembles the environment for the business operations of a private corporate entity; . . .

C.R.S., § 17–24–102(1) (1978).[30] While the Constitution may not specifically require that all prisoners be provided jobs, Colorado does. *Cf. Palmigiano v. Garrahy*, 443 F.Supp. at 980.

■ In prison condition cases, courts have not hesitated to order officials to provide meaningful educational programs. *See, e. g., Palmigiano v. Garrahy*, 443 F.Supp. at 989; *Laaman v. Helgemoe*, 437 F.Supp. 269, at 329–30; *Mitchell v. Untreiner*, 421 F.Supp. 886, 901 (N.D.Fla.1976); and *Alberti v. Sheriff of Harris County*, 406 F.Supp. 649, 673 (S.D.Tex.1975). One civilian teacher for a population of 800–900 prisoners and an effective budget of $3,000 is ridiculous even as a joke much less as a reality.

■ Recreation programs at Old Max are limited and the vast majority of these are athletic in character. Access to the gym is limited even for those in the general population, and almost nonexistent for those in the "special" populations such as administrative segregation and protective

---

**29.** *See* opinion at 157–158, *infra.*

**30.** The correctional industries program is not a recent response to problems at the Canon Correctional Facility. It was originally enacted in 1965, when the legislature declared that "the means [then] provided for the employment of prison labor [were] inadequate to furnish a sufficient number of prisoners with employment." Correctional Industries Act of 1965, C.R.S., § 105–8–1 (1965) (later C.R.S., § 27–25–102 (1973)). In emphasizing the purpose that "all provisions of this article shall be construed to rehabilitate prisoners with the intent of placing released prisoners back in society in a useful, productive manner," *id.*, it is significant that 12 years later, when the general assembly recodified the program at C.R.S., § 17–24–101 (1977), it would still find employment opportunities inadequate. While some improvements were made during the 12 year period, the evidence in this case makes it highly questionable that inmate employment during recent years has even approximated what it was in 1965.

custody. While "sophisticated" programs may not be required, "the right to reasonable opportunities for exercise is fundamental." *Laaman v. Helgemoe*, 437 F.Supp. at 309. *Accord, Palmigiano v. Garrahy*, 443 F.Supp. at 981; *Moore v. Janing*, 427 F.Supp. 567, 574–75 (D.Neb.1976). Especially here, where prison life for most inmates is characterized by idleness and prolonged daily confinement in their cells, adequate exercise is critical. *See Battle v. Anderson*, 376 F.Supp. at 424. Its relationship to the maintenance of health is obvious.

## HEALTH CARE

■ Of the many problems at Old Max, the blatant inadequacy of health care is perhaps the most appalling—despite the fact that courts have recognized that inmates have a fundamental right to receive needed care. *See Estelle v. Gamble*, 429 U.S. at 103–05, 97 S.Ct. 285; *Todaro v. Ward*, 565 F.2d 48, 52–53 (2d Cir. 1977); *Palmigiano v. Garrahy*, 443 F.Supp. at 983–84; *Laaman v. Helgemoe*, 437 F.Supp. at 311–15; and *Battle v. Anderson*, 376 F.Supp. at 424. As the Supreme Court said in *Estelle* :

> An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical 'torture or a lingering death,' . . . . In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. Cf. *Gregg v. Georgia* [428 U.S. 153], supra, at 173 [96 S.Ct. 2909, 2924–25, 49 L.Ed.2d 859] . . . . The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that 'It is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself.'

429 U.S. at 103–04, 97 S.Ct. at 290–291 (citations and footnotes omitted).

The failures of Old Max extend across the board from inadequate staff and resources to insufficient transportation arrangements to lack of training and qualification of the limited staff that does exist. The problem is not simply a matter of isolated incidents of alleged negligence or difference of opinion. It is a matter of such large scale failure as to evidence deliberate indifference to serious health needs. As I ruled from the bench, I consider the health care problems at Old Max an emergency situation and a matter of first importance.

■ Staffing is grossly inadequate. The primary care physician who has responsibility for the entire medical program is paid on a part-time basis and spends only three to five hours a week at the prison on actual patient care. Physician assistants who are not registered nurses are often the only persons on hand. There is no provision for qualified care on a 24-hour a day, 7-day a week basis. A psychiatrist sometimes comes to the prison once a month, and there is not a single Ph.D. trained psychologist on the prison staff. There are only three mental health counselors and none are Colorado-licensed as qualified clinicians. Mental health "treatment" is at best a matter of crisis intervention. The overall shortage of qualified staff endangers the health of the inmate population and is of constitutional magnitude. *See, e. g., Laaman v. Helgemoe*, 437 F.Supp. at 312; *Battle v. Anderson*, 376 F.Supp. at 415–16. *Also see Battle v. Anderson*, 457 F.Supp. 719, 727–29 (E.D. Okl.1978).

Because health services at Old Max are so limited, almost any substantial sort of medical, dental or psychiatric care must be performed elsewhere, primarily at the State Hospital in Pueblo. There is a single vehicle for transportation of inmates to Pueblo, and it is subject to competing uses, causing serious backlogs of persons waiting for needed care. Space for mental health problems from Old Max is severely limited at the State Hospital, causing most inmates suffering from those problems to be "warehoused" in administrative segregation, subject to the debilitating conditions of cell-

house 3. This is true despite the fact that Colorado law provides for the transfer of these inmates to mental health facilities.

> If . . . the executive director is of the opinion that [a] prisoner is mentally ill or retarded and cannot be well taken care of in the Colorado state reformatory or the state penitentiary, it is his duty to place said mentally ill or retarded prisoner without delay in an institution for the care and treatment of the mentally ill or retarded, there to be treated and confined . . . .

C.R.S., § 17–23–101(2) (1978). The evidence is compelling that inmates with mental health needs "cannot be well taken care of" at Old Max.[31]

Finally, despite indications that the vast majority of inmates come to the Canon Correctional Facility with drug and alcohol problems, treatment programs are wholly inadequate and do not conform to the purpose of C.R.S., § 25–1–304 (1978) to establish programs in conjunction with the Division of Alcohol and Drug Abuse of the Department of Health.

### CLASSIFICATION

■ While there is no constitutional right to classification as such, a valid classification system provides a reasonable method by which prison officials can protect and afford to inmates other constitutional rights such as safety and medical care. As the district court said in *Palmigiano v. Garrahy*, 443 F.Supp. at 965 (footnote omitted):

> Classification is essential to the operation of an orderly and safe prison. It is a prerequisite for the rational allocation of whatever program opportunities exist within the institution. It enables the institution to gauge the proper custody level of an inmate, to identify the inmate's educational, vocational and psychological needs, and to separate non-violent inmates from the more predatory. These goals are recognized by state law, which provides that classification shall serve a rehabilitative function. Classification is also indispensable for any coherent future planning.

*Accord, Doe v. Lally*, 467 F.Supp. 1339, 1353 (D.Md.1979); *Pugh v. Locke*, 406 F.Supp. at 324. When a classification system is established, however, its decisions "cannot be arbitrary, irrational or discriminatory," *Laaman v. Helgemoe*, 437 F.Supp. at 318, since inmates are not deprived of all protection of due process and equal protection. *See Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (per curiam); and *Pugh v. Locke*, 406 F.Supp. at 330.[32]

■ The due process clause of the Fourteenth Amendment does not itself create a protected interest in the initial assignment of offenders to a particular place of confinement. Such an interest, if it exists, is created by state law. *See Meachum v. Fano*, 427 U.S. 215, 224–27, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes*, 427 U.S. 236, 242–43, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). Colorado has enacted a diagnostic and classification program at C.R.S., § 17–40–102 (1978). In doing so, the general assembly said:

> The primary function and purpose of the program shall be to provide a diagnostic examination and evaluation of all offenders sentenced by the courts of this state, so that each such offender may be assigned to a correctional institution which has the type of security and, to the extent possible, appropriate programs of education, employment, and treatment available, which are designed to accomplish maximum rehabilitation of such offender and to prepare an offender for placement into as productive an employment as possible following imprisonment.

---

**31.** On the rights of mentally ill persons in state custody, *see generally Romero v. Schauer*, 386 F.Supp. 851 (D.Colo.1974) (three-judge court).

**32.** *Cf. Gregg v. Georgia*, 428 U.S. 153, 188–89, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Furman v. Georgia*, 408 U.S. 238, 242–57, 274–77, 309– 10, 312–13, 363–66, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (concurring opinions of Douglas, Brennan, Stewart, White and Marshall, JJ., respectively) (infliction of severe punishment unconstitutional where arbitrary, capricious or discriminatory).

*Id.* at 17–40–102(2). All offenders are to be processed through the diagnostic services which have been centralized at the Canon Correctional Facility in order to identify their treatment and employment needs. A recommendation is then made as to their place of confinement. *See* C.R.S., §§ 16–11–308 and 17–40–103 (1978). I have held in a somewhat related case that Colorado law and regulation create a protected liberty interest in classification decisions. *See Marioneaux v. Colorado State Penitentiary,* 465 F.Supp. 1245, 1248 (D.Colo.1979). *Accord, Gurule v. Wilson,* Consolidated Civil Action No. 74–A–926 (D.Colo. April 3, 1978). *Cf. Palmigiano v. Garrahy,* 443 F.Supp. at 980–82; *Anderson v. Redman,* 429 F.Supp. 1105, 1121–22 (D.Del.1977). It is well-established that "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). In according deference to prison officials and accommodating "institutional needs and objectives and the provisions of the Constitution," *Wolff v. McDonnell,* 418 U.S. at 556, 94 S.Ct. at 2975, due process does not require a hearing at the initial classification stage. *See Laaman v. Helgemoe,* 437 F.Supp. at 319. Interviews with an inmate must be part of the process, and the statutes require that a requesting inmate generally be shown a copy of the recommendation and receive an explanation. *See* C.R.S., §§ 16–11–308(4) and 17–40–103(2) (1978).[33] Due process and equal protection do require that a classification system bear some rational relationship to the object being sought. Defendants have said that a

classification system that separates prisoners by "age, offense, physical aggressiveness, or other criteria" is constitutionally valid, citing *Goldsby v. Carnes,* 365 F.Supp. 395, 402 (W.D.Mo.1973), *modified by consent,* 429 F.Supp. 370 (W.D.Mo.1977). As a general proposition, I agree. There are a number of ways that inmates might be classified in a manner that comports with due process and equal protection. But the evidence in this case raises substantial doubt about the validity of the classification system which defendants have adopted. No acceptable validation study has been performed, and Dr. Eber admits that the predictions are so poor that they should only be used in making initial decisions and then only when no other significant information is available. After that, says Dr. Eber, classification decisions should be based on an inmate's actual behavior.[34]

The basic failure of the diagnostic and case management program at Old Max is that the information is almost meaningless in making facility assignments and in affording inmates the various program opportunities which the diagnostic survey has recommended. The evidence shows that overclassification is the rule, not the exception, and that large numbers of inmates are housed at Old Max even though they have been classified for lesser security facilities.[35] In fact, actual departmental regulations make the diagnostic recommendation totally irrelevant where, for instance, an inmate has more than six years remaining before parole eligibility. In such cases, the inmate is automatically confined at Old Max.[36] Finally, no matter what rehabilitation or vocational program is recommended, the evi-

---

**33.** Due process requires more where disciplinary proceedings are involved, *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), or where inmates are regressively classified. *Marioneaux v. Colorado State Penitentiary,* 465 F.Supp. 1245, 1248 (D.Colo.1979).

**34.** I do not hold that an offender has a protected interest in any particular classification decision. Once a classification procedure is validated in an acceptable manner, individual decisions will not be subject to review except on a showing of abuse or bad faith in its application.

**35.** Both situations—overclassification and "over"-assignment—are evidenced by the planned capacity at the new maximum security facility of approximately 340 as compared to the present Old Max population of 850 inmates.

**36.** Defendants have said that a "variance" from this regulation is possible, but the evidence shows that only a relative handful have been granted.

dence shows that the diagnostic procedure is mostly in vain, since programs are not in fact available. Though capable of redemption, the classification system is presently unconstitutional.

## ACCESS

The Supreme Court of the United States has held that "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. at 822, 94 S.Ct. at 2804. Although the fact of confinement and the needs of the prison may impose some limitations on the inmate's constitutional rights, restrictions must be reasonable and must be justified by legitimate policies and goals of the corrections system. *See Jones v. North Carolina Prisoners' Union*, 433 U.S. at 129–30, 97 S.Ct. 2532.

Restrictions on visitation are particularly critical since they may prevent inmates from maintaining meaningful family bonds and community ties which promote rehabilitation and successful return to society. As the district court said in *Pugh v. Locke*, 406 F.Supp. at 327:

The chances of successful rehabilitation or the chances of escaping mental and physical degeneration are also diminished by the fact that prison environment is much different from that in the society to which an inmate must return. Current visitation policies discourage visits— which are essential to the maintenance of community ties—and therefore decrease an inmate's chances of successful reintegration upon release.

*Accord, Laaman v. Helgemoe*, 437 F.Supp. at 320; *Wesson v. Johnson*, Colo., 579 P.2d 1165 (1978) (en banc) (pretrial detainees).

Restrictions on family visits must be accommodated with clear constitutional protection of family life. The Supreme Court recently surveyed this area in *Moore v. City of East Cleveland*, 431 U.S. 494, at 499, 97 S.Ct. 1932, at 1935–1936, 52 L.Ed.2d 531 (1977) and stated:

'This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.' *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639–640 [94 S.Ct. 791, 796, 39 L.Ed.2d 52] (1974). A host of cases, tracing their lineage to *Meyer v. Nebraska*, 262 U.S. 390, 399–401 [43 S.Ct. 625, 626–627, 67 L.Ed. 1042] (1923), and *Pierce v. Society of Sisters*, 268 U.S. 510, 534–535 [45 S.Ct. 571, 573–574, 69 L.Ed. 1070] (1925), have consistently acknowledged a 'private realm of family life which the state cannot enter.' *Prince v. Massachusetts*, 321 U.S. 158, 166 [64 S.Ct. 438, 442, 88 L.Ed. 645] (1944). See, *e. g., Roe v. Wade*, 410 U.S. 113, 152–153 [93 S.Ct. 705, 726–727, 35 L.Ed.2d 147] (1973); *Wisconsin v. Yoder*, 406 U.S. 205, 231–233 [92 S.Ct. 1526, 1541–1542, 32 L.Ed.2d 15] (1972); *Stanley v. Illinois*, 405 U.S. 645, 651 [92 S.Ct. 1208, 1212, 31 L.Ed.2d 551] (1972); *Ginsberg v. New York*, 390 U.S. 629, 639 [88 S.Ct. 1274, 1280, 20 L.Ed.2d 195] (1968); *Griswold v. Connecticut*, 381 U.S. 479 [85 S.Ct. 1678, 14 L.Ed.2d 510] (1965); *id.*, at 495–496 [85 S.Ct. 1678, at 1687–1688] (Goldberg, J., concurring); *id.*, at 502–503 [85 S.Ct. 1678, at 1691–1692] (White, J., concurring); *Poe v. Ullman*, 367 U.S. 497, 542–544, 549–553 [81 S.Ct. 1752, 1776–1777, 6 L.Ed.2d 989] (1961) (Harlan, J., dissenting); *cf. Loving v. Virginia*, 388 U.S. 1, 12 [87 S.Ct. 1817, 18 L.Ed.2d 1010] (1967); *May v. Anderson*, 345 U.S. 528, 533 [73 S.Ct. 840, 843, 97 L.Ed. 1221] (1953); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 [62 S.Ct. 1110, 1113, 86 L.Ed. 1655] (1942). Of course, the family is not beyond regulation. See *Prince v. Massachusetts, supra* [321 U.S.], at 166 [64 S.Ct. 438, at 442]. But when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation. See *Poe v. Ullman, supra* [367 U.S.], at 554 [81 S.Ct. 1752, at 1782] (Harlan, J., dissenting).

As with other constitutional protections, some of these are withdrawn to varying degrees when a person is legally incarcerated as punishment. The most obvious are those involving procreation, since conjugal visits are not yet recognized as a constitutional right. But other family interests survive, and like First Amendment ones, can only be limited on account of important governmental interests and only by restrictions which are not unnecessarily broad. *Cf. Procunier v. Martinez*, 416 U.S. 396, 413–14, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

■ The present restrictions on family visits at Canon City are overbroad and prevent or impair meaningful visitation without being necessary to any legitimate penological purpose. Individual cases which present security problems or·in which there has been a previous abuse of visitation rights may be dealt with by prison officials by means other than blanket restrictions on all inmates. Where there is a valid reason to believe that visitation rights have been abused in a particular case, prison officials may take reasonable steps to investigate and, if necessary, to correct the situation, but a general, undifferentiated suspicion of all inmates, all visitors and all visits does not allow the overly broad procrustean restraints which are presently in effect. Those restraints are an exaggerated and excessive response to concerns for prison security.

■ The Constitution affords less protection to visits by those who are not family members. Restrictions on the freedom to associate are predictable consequences of incarceration. Prison security justifies greater restrictions on these visits than those involving family. *See generally Hardwick v. Ault*, D.C., 447 F.Supp. 116, at 131; *Laaman v. Helgemoe*, 437 F.Supp. at 320–22; and *Hamilton v. Saxbe*, 428 F.Supp. 1101, 1109–1113 (N.D.Ga.1976). Still, an absolute ban on visits by non-relatives is not a regulation "wisely adapted to individual circumstances . . . or included in general rules which allow prisoners reasonable visitation." *Newman v. Alabama*, 559 F.2d 283, 291 (5th Cir. 1977), *cert.*

*denied in relevant part sub nom. Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). Visits by certain individuals may have a strong positive effect on an inmate's chances for rehabilitation and prevent deterioration of both mental health and important bonds to law-abiding citizens outside the walls. Restriction to a limited number of screened and approved non-relative visitors is allowable, as is restriction on the number of visits that each such person can have each month. Present regulations at the Canon Correctional Facility allow three non-relative visitors only when a prisoner does not have family in Colorado. The regulation is overly broad. Non-relative visitors should be allowed to visit those inmates who do have family in the state and should be allowed at least one visit during a reasonable span of time such as once a month. Approval of these visitors is subject to procedural safeguards such as notice of disapproval and an opportunity for review. *See Laaman v. Helgemoe*, 437 F.Supp. at 321, 330; *Hamilton v. Saxbe*, 428 F.Supp. at 1112–13.

The constitutional considerations regarding restrictions on correspondence are similar to those regarding visitation:

First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad.

*Procunier v. Martinez*, 416 U.S. 396, 413–14, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974).

General correspondence to and from inmates is subject to being read and inspected, but only according to specific and well-defined criteria and when accompanied by adequate procedural safeguards. *See Procunier v. Martinez*, 416 U.S. at 413–19, 94 S.Ct. 1800; *Guajardo v. Estelle*, 580 F.2d 748, 56–57 (5th Cir. 1978); *McKinney v. De Bord*, 507 F.2d 501, 505 (9th Cir. 1974); *Hardwick v. Ault*, 447 F.Supp. 116, 128–30 (M.D.Ga.1978); and *Minnesota Civil Liberties Union v. Schoen*, 448 F.Supp. 960, 966 (D.Minn.1977). To be legitimate, "censorship" must focus *only* on matters which are important governmental concerns, such as interception of information concerning proposed criminal activity or encoded messages, and not on matters such as "statements that 'unduly complain' or 'magnify grievances,'" *Procunier v. Martinez*, 416 U.S. at 415, 94 S.Ct. 1800, 1812 or that involve "'improper language' or 'gossip,'" *Battle v. Anderson*, 376 F.Supp. 402, at 425, or that personally offend the censor. *Hardwick v. Ault*, 447 F.Supp. at 131. Not only are such concerns unjustified, but vague and general proscriptions invite too much discretion. Procedural safeguards require that an inmate be notified of the rejection of a letter written by or addressed to him, that the writer be given a reasonable opportunity to protest the decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence. *See Procunier v. Martinez*, 416 U.S. at 418–19, 94 S.Ct. 1800;

*Battle v. Anderson*, 376 F.Supp. at 425.[37] A notice that certain correspondence has been rejected must include a brief but adequate explanation, and the rejected correspondence must be returned to the sender. Regulations at the Canon Correctional Facility meet these standards.

With regard to receipt of publications through the mail, Canon Correctional Facility officials prohibit inmates from receiving periodicals and other materials that are not mailed directly from the publisher or an established vendor or distributor. This issue was recently addressed by the Supreme Court in *Bell v. Wolfish*, 441 U.S. at 548–52, 99 S.Ct. at 1879–81, 60 L.Ed.2d at 475–77, but the only rule that emerges from that decision is that "a prohibition against receipt of hardback books unless mailed directly from publishers, book clubs or bookstores does not violate the First Amendment rights of . . . inmates." *Id.*, 441 U.S. at 550, 99 S.Ct. at 1880, 60 L.Ed.2d at 476.[38]

A recent Tenth Circuit decision is somewhat more general. In *Woods v. Daggett*, 541 F.2d 237 (10th Cir. 1976), the court of appeals upheld a publisher-only rule as applied to prisoners' receipt of published materials, finding that the rule met the standards set forth in *Procunier v. Martinez* and discussed above. *Accord, Guajardo v. Estelle*, 580 F.2d at 762.[39] The Canon Correctional Facility rule is allowable.

---

37. The scope of these protections include restrictions or censorship based on the identity or character of correspondents; the interested correspondent, as well as the inmate, must be given notice and provided the safeguards set forth above. *See Battle v. Anderson*, 376 F.Supp. at 425.

38. Subsequent to the court of appeals decision, the Bureau of Prisons had amended its rule to permit the receipt of publications also from bookstores and proposed to amend the rule further to allow paperbacks and other soft-covered materials to be received from any source. *Bell v. Wolfish*, 441 U.S. at 549, 99 S.Ct. at 1879, 60 L.Ed.2d at 475. The question whether the original rule was constitutional was therefore not before the court.

39. The specific publications involved in *Woods v. Daggett*, 541 F.2d 237 (10th Cir. 1976), were

law books, access to which is entitled to greater protection than general reading material. Even so, the publisher-only rule was upheld.

The rule does not cause books and other materials to be limited to those which an inmate himself can afford. Relatives and friends can pay for and order books, including paperbacks, from publishers or established vendors and distributors, and have them delivered directly to the Canon Correctional Facility. CCF Regulation 302–18(12). Books are not counted against an inmate's package limit. *Id.*

I note, however, that unless adequate library facilities are soon provided for all inmates, I will reconsider this portion of my decision and order any additional relief that appears appropriate.

Plaintiffs also attack two more particular restrictions on correspondence. The first is defendants' policy of refusing to deliver mail in a language other than English, and the second is a practice of limiting receipt of mail when certain correspondence would allegedly cause severe psychiatric or emotional disturbance to an inmate. As to the former, I have stated elsewhere that inmates do not forfeit the safeguards provided by equal protection. *See, e. g., Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (per curiam). A third of the population at Old Max is Hispanic and the English language rule seriously infringes protected First and Fourteenth Amendment interests without being necessary to any legitimate penological purpose. If prison officials are concerned that secret messages might be passed in Spanish, it is incumbent on a state with such a large Hispanic population to utilize a person capable of understanding Spanish to perform the censoring function or else forego it. The rule is unconstitutional.

The second of the restrictions is not wholly unreasonable on its face, but the anomaly is that there is no qualified psychiatrist or psychologist at the prison to make a decision whether receipt of certain correspondence would cause severe psychological disturbance. Until such time as there is, the rule is void and may not be applied.

The constitutional rules are different where privileged correspondence such as mail to or from a court or attorney is involved. Outgoing privileged mail cannot be opened *at all, Guajardo v. Estelle*, 580 F.2d at 757–59; *Taylor v. Sterrett*, 532 F.2d 462, 473–78 (5th Cir. 1976), except on reasonable and specific cause to believe that contraband or improper communication is involved. *See, e. g., Taylor v. Sterrett*, 532 F.2d at 475; and *Hardwick v. Ault*, 447 F.Supp. at 129–130. General, undifferentiated suspicion is not sufficient cause, and such determination of cause and the interception of privileged mail will be subject to the same procedural safeguards as those regarding general correspondence. Apart from such exceptional circumstances, prison officials may take reasonable steps to verify that addressed persons are in fact privileged correspondents, *see, e. g., Wolff v. McDonnell*, 418 U.S. at 576–77, 94 S.Ct. 2963, *Guajardo v. Estelle*, 580 F.2d at 758–59, so long as those steps do not cause unnecessary delay or interference with privileged mail.

Incoming privileged mail is subject to inspection for contraband, *Wolff v. McDonnell*, 418 U.S. at 577, 94 S.Ct. 2963, but only in the presence of the inmate. *See Guajardo v. Estelle*, 580 F.2d at 757–59; *Hardwick v. Ault*, 447 F.Supp. at 130; and *Carty v. Fenton*, 440 F.Supp. 1161, 1162–63 (M.D.Pa.1977).[40]

Defendants' regulations comply with these requirements except in two respects. First, the Canon Correctional regulation does not make clear that in those exceptional circumstances when outgoing privileged mail may be opened, it can only be opened in the presence of the sending inmate. Such presence is required. Second, in defining "legal mail," the regulations say that it is "any mail directed between an inmate and any public official or agency or any lawyer with respect to either his criminal conviction *or a complaint he might have concerning the administration of the prison under exceptional circumstances*." CCF Regulation 302–18(6) (emphasis added). The latter qualification is not allowable. Legal mail is not subject to review as to the kind of problem or complaint being asserted, or according to the degree or extent of such problem or complaint. Any mail to or from "a licensed

---

**40.** By way of the same reasonable and specific cause set out above, incoming privileged mail in exceptional circumstances may be read in order to intercept improper communications, but only in the presence of the inmate. Any other communications are immune from censorship.

There is no evidence that gives me reason to doubt the good faith of defendants in this matter, but I mean for these rules and safeguards to be *strictly* applied. If *bad faith or abuse* of the allowed measures is shown, I will enter any additional orders that appear necessary to correct the situation.

attorney who is representing an inmate in a criminal or civil [or administrative] matter, is being contacted to represent or is contemplating representing an inmate in [any such matter]," CCF Regulation 302–18(6), is legal mail.

 It is beyond cavil that prisoners have a constitutional right to meaningful access to the courts, and that states have an affirmative obligation to assure such access. *See Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Wolff v. McDonnell*, 418 U.S. at 577–80, 94 S.Ct. 2963; and *Younger v. Gilmore*, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971) (per curiam). As the Supreme Court said in *Bounds v. Smith*:

> [T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.
>
> . . . . .
>
> It should be noted that while adequate law libraries are one constitutionally acceptable method to assure meaningful access to the courts, our decision . . . does not foreclose alternative means to achieve that goal. Nearly half the States and the District of Columbia provide some degree of professional or quasi-professional legal assistance to prisoners. . . . Independent legal advisors can mediate or resolve administratively many prisoner complaints that would otherwise burden the courts, and can convince inmates that other grievances against the prison or the legal system are ill-founded, thereby facilitating rehabilitation by assuring the inmate that he has not been

treated unfairly. . . . Nevertheless, a legal access program need not include any particular element we have discussed, and we encourage local experimentation. *Any plan, however, must be evaluated as a whole to ascertain its compliance with constitutional standards.*

430 U.S. at 828–32, 97 S.Ct. at 1498–1500 (citations and footnotes omitted; emphasis added).[41]

Besides *Bounds*, the other important case in this circuit is *Twyman v. Crisp*, 584 F.2d 352 (10th Cir. 1978). In *Twyman*, the court of appeals said that a regulation allowing two hours a week in the law library had not been shown actually to prejudice the named plaintiff's access to the courts. The constitutional holding of the decision is not clear, however, since, while the appeal was pending, the regulation was changed to increase the library time to an average of 11 and one-half hours a week. The court said, in addition to its conclusion above, that "[s]ince the rules have now been changed to provide considerably more time, this claim is without merit." 584 F.2d at 358. In *Bounds*, part of the approved library plan consisted of an average of one full day every three or four weeks, and this was acceptable when accompanied by other available types of assistance, such as trained inmate research assistants and typists. 430 U.S. at 819, 97 S.Ct. 1491.

 At the Canon Correctional Facility, the maximum number of inmates who may have access to the various law libraries on any given day is 13, totalling 65 for an entire week. Each would have library time of three hours or less. With a population of 850 inmates, this would mean a law library capacity of three hours per inmate every 13 weeks. It is fairly certain, of course, that

41. The Supreme Court noted in *Bounds v. Smith* that correctional administrators have widely supported prison legal assistance programs:

> Nearly 95% of the state corrections commissioners, prison wardens, and treatment directors responding to a national survey supported creation and expansion of prison legal services. . . . Almost 85% believed that the programs would not adversely

affect discipline or security or increase hostility toward the institution. Rather, over 80% felt legal services provide a safety valve for inmate grievances, reduce inmate power structures and tensions from unresolved legal problems, and contribute to rehabilitation by providing a positive experience with the legal system.

430 U.S. 817, 829 n. 18, 97 S.Ct. 1491, 1499 n. 18, 52 L.Ed.2d 72 (1977).

not all inmates will be preparing legal materials at any one time, but even a considerably smaller number of inmate litigants would average only three hours of library time every four to six weeks.[42] That amount of time fails to meet even the two hour a week holding in *Twyman*, as well as the one full day every three to four weeks which the Supreme Court held sufficient in *Bounds*.

Once an inmate gains access to a law library, its contents must be constitutionally adequate. *See Bounds v. Smith*, 430 U.S. at 828, 97 S.Ct. 1491; *Battle v. Anderson*, 457 F.Supp. 719, 736 (E.D.Okl. 1978); and *Gilmore v. Lynch*, 319 F.Supp. 105, 111 (N.D.Cal.1970), *aff'd sub nom. Younger v. Gilmore*, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971) (per curiam). The small libraries in cellhouses 3 and 7 are totally inadequate for effective researching and framing of issues. The general population library, while more extensive than the collections in cellhouses 3 and 7, is still inadequate. It contains only half of the volumes recommended by the American Association of Law Libraries Committee on Law Library Services to Prisoners.

Plaintiffs also complain about lack of typewriters and inadequate access to photocopy equipment. Since prisoners are not prejudiced by the filing of handwritten documents, there is no constitutional right to typewriters. *See Twyman v. Crisp*, 584 F.2d at 358; *Stubblefield v. Henderson*, 475 F.2d 26, 26 (5th Cir. 1973). *Also see Wolfish v. Levi*, 573 F.2d 118, 132 (2d Cir. 1978), *rev'd on other grounds sub nom. Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). I have not been able to find a case which holds that inmates have a constitutional right of meaningful access to photocopy equipment, but given serious restraints on library time and a rule that prohibits inmates from taking legal materi-

als out of the library, adequate access to a photocopy machine may be called for. As set forth in *Bounds v. Smith*, the question in any particular case is whether a prison's facilities and rules, taken as a whole, provide inmates with meaningful access to the courts. The Canon Correctional Facility's do not.[43]

[58, 59] "States must shoulder affirmative obligations to assure all prisoners meaningful access to the courts." *Battle v. Anderson*, 457 F.Supp. at 736. I have previously quoted this decision regarding access in holding that "[t]o be meaningful, the right of access to the courts must include the means to frame and present legal issues and relevant facts effectively for judicial consideration." *Mingo v. Patterson*, 455 F.Supp. 1358, 1361 (D.Colo.1978). It is not required that a penitentiary even have a law library if the state should choose some other means of insuring access. Thus, a state could provide counsel through its public defender system or it could contract with an agency or foundation or law school to provide this service. Here, however, defendants have apparently opted to provide law libraries and inmate assistance. While there are indeed serious and well founded criticisms of the use of this option, it is still constitutionally permissible if minimum standards are met in provisioning the law libraries with adequate books and materials and in maintaining constant vigilance to assure that inmate assistance is neither inadequate nor incompetent. Generally speaking, it takes considerable skill, money and time to maintain an adequate functioning law library. The law libraries at Old Max fall below any known acceptable standards. While it is entirely within the province of the defendants to opt for the law library and inmate legal assistant means of providing access to the courts, the wisdom of choosing it when other more efficient and less expensive means are available is

---

42. Sign-up for library time is on a first-come, first-served basis, except that there is an exception for inmates facing court deadlines.

In addition, prison regulations provide that legal materials cannot be "checked out" or removed from the libraries.

43. It is also clear that prison officials must provide access to a notary, and not interfere with legal and official mail, except for a limited inspection for contraband as set out above. *See Bryan v. Werner*, 516 F.2d 233 (3rd Cir. 1975).

indicative of the environment in which constitutional violations abound.

## ORDER

The defendants have not attempted to defend by asserting that plaintiffs' constitutional rights have not been violated. The defense is something in the nature of confession and avoidance. Defendants admit, or concede, that significant violations have existed at least since the mid-1970s. They have argued, instead, that Colorado has made substantial and good faith efforts to resolve what they describe as problems and what I call violations of law. It is not only the constitution and federal law which defendants have violated. There is a veritable litany of state laws and regulations which have been and are being violated.[44]

 Defendants argue that they have made "wrenching" good faith efforts to correct the violations which exist. The evidence does not support the defense. Further, it is well-established that good faith efforts, even wrenching ones, are not a defense to equitable relief from constitutional violations. Nor is lack of financing. The trial court in *Battle v. Anderson* answered these same arguments:

This Court is well aware of the financial restraints placed on the Defendants and their efforts to comply with the Constitution. But the good will shown by the Defendants cannot serve as a defense. *Finney v. Arkansas Board of Correction, supra; Rozecki v. Gaughan* [1 Cir., 459 F.2d 6], *supra; Holt v. Sarver,* 309 F.Supp. 362, 385 (E.D.Ark.1970); and *Davis v. Lindsay,* 321 F.Supp. 1134, 1139 (S.D.N.Y.1970). Nor is the lack of financing a defense to a failure to provide minimum constitutional standards. *Jackson v. Bishop,* 404 F.2d 571, 580 (8th Cir. 1968); *Finney v. Arkansas Board of Corrections, supra* at 199; *Alberti v. Sheriff of Harris County, Texas, supra* [D.C., 406 F.Supp. 649], at 669; and *Hamilton v. Love, supra* [D.C., 328 F.Supp. 1182], at 1194. If the State of Oklahoma wishes to hold the inmates in institutions, it must provide the funds to maintain the inmates in a constitutionally permissible manner.

447 F.Supp. at 526. The Tenth Circuit not only affirmed the trial court's order, but specifically agreed that even "significant progress" by Oklahoma was not a defense to continuing constitutional violations.

We agree with the Trial Court finding, that while the State of Oklahoma has

---

44. The State of Colorado has violated or failed to pursue the requirements of its own laws set forth in the following statutes or regulations: C.R.S., §§ 16–8–101 *et seq.* (1978), governing procedures to be followed in dealing with persons found incompetent or insane; C.R.S., § 16–11–308(3) (1978), requiring that a recommendation be made by the executive director of the department of corrections as to the place of confinement or rehabilitation program which is the most likely to result in the maximum rehabilitation of an offender; C.R.S., § 17–20–115, 117 (1978), requiring that each inmate perform labor most suitable to his capacity and most advantageous to the needs of the state, and that he be paid for his labor; C.R.S. §§ 17–40–102, 103(1) (1978), defining procedures to be followed in dealing with mentally ill or retarded prisoners; C.R.S. §§ 17–24–101 *et seq.* (1978), providing rules, regulations, and procedures for the division of correctional industries which provides jobs and other work activities for offenders; C.R.S. § 24–90–107 (1973), requiring the state librarian to furnish library services to penal institutions; C.R.S. § 25–1–304(1)(d) (1978), calling for cooperation between the division of alcohol and drug abuse and the de-

partment of corrections in establishing and conducting programs for the prevention of alcoholism and treatment of alcoholics in corrections institutions; Rules and Regulations Governing Sanitation in Barber Shops in Colorado; 6 CCR 1011–1, setting forth applicable community clinic and emergency medical care requirements such as clinical and emergency services and psychiatric care; 6 CCR 1009–1, providing regulations pertaining to communicable diseases; and C.R.S., § 25–5–303 (1973), prohibiting the reuse of any bedding material used by a person having an infectious or contagious disease.

Obedience to law is a two-way street. While I suspect that a number of people have little sympathy for individuals who have violated the law and been convicted and sentenced to confinement at the Canon Correctional Facility, the state of Colorado and its officials are under no less an obligation to obey both state and federal law. Our system of justice does not have room for the double standard that the acts and omissions of defendants suggest. Nor does it recognize lack of funding as a defense.

made significant progress in correcting many of the abuses and/or providing for new or additional facilities, personnel and programs within its penal system, still the State has not prevented the degenerated . . . conditions which have come to pass at the Oklahoma State Penitentiary at McAlester and at the Oklahoma State Reformatory at Granite.

564 F.2d at 402. Other courts have agreed. See, e. g., Smith v. Sullivan, 553 F.2d 373, 378 (5th Cir. 1977); Gates v. Collier, 5 Cir., 501 F.2d 1291, at 1319–20; Rozecki v. Gaughan, 459 F.2d 6, 8 (1st Cir. 1972); Doe v. Lally, 467 F.Supp. at 1351; Palmigiano v. Garrahy, 443 F.Supp. at 985; Pugh v. Locke, 406 F.Supp. at 330–31; and Holt v. Sarver, 309 F.Supp. at 385. As I said in ruling from the bench, the Constitution does not permit cruel and unusual punishment today on the theory that somewhere down the line it might be corrected. To quote from Judge Henley's landmark decision in Holt v. Sarver, 309 F.Supp. at 383, "[t]he handwriting is on the wall, and it ought not to require a Daniel to read it."

A number of other themes have been presented by the defendants which require some comment. The first, and most frequently recurring, is that the state has spent significant sums for the construction of new maximum and close security facilities designed in accordance with the most enlightened concepts known to date. First, however, a future facility does nothing to eliminate present violations. Second, the proposed facility will not increase the capacity of state correctional facilities. There has been no showing that the present or proposed facilities are adequately staffed; that the staff is adequately trained; that staff training will continue; that adequate health services will be provided; that idleness will be eliminated or that organization will permit personnel to comply with stated job responsibilities without interference or futility. Indeed, the meager evidence presented on these points suggests that the new facilities may very well aggravate rather than mitigate the problems which presently exist.

The second theme which defendants have offered is that they have had to make choices under very restrictive conditions. Defendants assert that they have employed a utilitarian calculus to obtain maximum results from limited resources. Thus, defendants say that they have concentrated their efforts and resources on the places where such would accomplish the most. Defendants directed these efforts and resources to minimum security and medium security institutions, since these institutions require less resources and successful results are more easily realized. The decision may indeed be described as rational and intelligent, but it was made at a cost which cannot be accepted. The decisions obviously did not include consideration of the quintessential question which all republican governments must address; that is, does the constitution permit or prohibit this course of action? The utilitarian calculus does not provide a means by which that question may be answered. Instead of giving proper consideration to the rights of individuals, the decision was harnessed to a balance sheet. The results of this process are there for everyone to see. Indeed, if the Colorado Department of Corrections were Dorian Gray, the Canon Correctional Facility would be its portrait.

In granting relief for violation of prisoners' constitutional rights, courts have taken a number of approaches. Some have entered comprehensive orders, detailing their requirements and setting up timetables for compliance. See, e. g., Pugh v. Locke, 406 F.Supp. at 331–32, modified in relevant part and remanded sub nom. Newman v. Alabama, 559 F.2d at 290; Jones v. Wittenberg, 73 F.R.D. 82 (N.D.Ohio 1976). Also see Jones v. Wittenberg, 440 F.Supp. 60 (N.D.Ohio 1977). In Palmigiano v. Garrahy, 443 F.Supp. at 986–89, the district court entered a comprehensive order and mandated that the unconstitutional facility be closed within one year. The court appointed a special master to file monthly reports and gave him extensive authority to oversee and implement compliance, including the authority to recommend staff hiring and transfers. Judge Johnson, faced with

repeated delay and recalcitrance in *Newman v. Alabama*, 466 F.Supp. 628, 635–39 (M.D.Ala.1979), appointed the governor of Alabama as receiver for the prison system and transferred all corrections' responsibilities and functions directly to the governor's office.

Still other courts have ordered population reductions in overcrowded prison facilities, *see, e. g., Battle v. Anderson*, 447 F.Supp. at 526, *aff'd*, 564 F.2d at 398–403, while others have ordered institutions to be closed. *See, e. g., Battle v. Anderson*, 457 F.Supp. at 738–39; *Palmigiano v. Garrahy*, 443 F.Supp. at 986; and *Gates v. Collier*, 407 F.Supp. 1117, 1122–23 (N.D.Miss.1975), *aff'd and remanded*, 548 F.2d 1241 (5th Cir. 1977). In *Hutto v. Finney*, 437 U.S. 678, 687–88, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), the Supreme Court recently affirmed the broad equitable power of lower federal courts to remedy continuing constitutional violations, especially where defendants have had repeated opportunities to resolve the problems themselves. The court recognized the interdependence of many prison violations and held that the comprehensive order entered by the district court was justified.

These remedies are available should they become necessary. In the first instance, however, most courts have provided state defendants with an initial opportunity to put their own house in order by presenting a plan that assures immediate attention to bringing a corrections system into constitutional compliance. *See, e. g., Doe v. Lally*, 467 F.Supp. at 1354–55; *Holt v. Sarver*, 309 F.Supp. 362, 385 (E.D.Ark.1970), *aff'd*, 442 F.2d 304 (8th Cir. 1971). While this is the first adjudication of large-scale constitutional violations at the Canon Correctional Facility, there is a substantial history of recognized problems and inadequate attention, even indifference, to them, notwithstanding humanitarian efforts by some state officials. None of these problems are recent ones. The institution has been studied again and again, and each of these studies has found serious deficiencies. Still another study is not an adequate response. Delay will not be accepted.

No one seriously suggests that prisons should be a desirable place to be. They exist to confine *as punishment* those who have violated the criminal law. Still, as the court of appeals said in *Battle v. Anderson*, 564 F.2d at 403:

> While neither this Court nor the District Court holds to the proposition that prisoners subjected to the punishment of incarceration are entitled to the rights and privileges of one who has not committed a crime against person or property crying out for retribution, still the infliction of cruel and unusual punishment cannot be countenanced in an orderly society. While the rights and privileges necessarily lost—and, in effect, surrendered—by prisoners in punishment for crimes committed are many and varied, they cannot be denied all rights and privileges.

It is abundantly clear that the plaintiff class has suffered from pervasive and frequent violations of federally protected rights. It is uncontradicted by any evidence that Old Max is unfit for continued human habitation. It is established by clear and convincing evidence that members of the plaintiff class have suffered denials of due process and the infliction of cruel and unusual punishment as a result of some of defendants' practices and procedures and many of defendants' omissions. Accordingly, it is

ORDERED that Old Max shall be closed. It will no longer be used to confine inmates either temporarily, permanently or on a standby basis. Defendants herein are forever enjoined from confining members of the plaintiff class in the Canon Correctional Facility. It is further

ORDERED that execution of this order shall be stayed for a period of forty five (45) days from the date hereof subject to the following conditions:

1. Defendants must take immediate and continuing steps to cease and desist from maintaining conditions which violate federal and state law and which have been discussed or referred to in this opinion and any of its footnotes.

2. Defendants must present a detailed plan which sets forth the means by which the plaintiff class will be forever protected from further violations of their Eighth and Fourteenth Amendment rights. Such plans must be in furtherance of, but not necessarily limited to the following principles:

a. The Principle of Productive Activity. The selection of programs and the kinds of activities to be used are matters for the defendants to determine. Jobs, recreation, treatment, education, labor and training may all be used to achieve this end. The object is to eliminate forced idleness. Each inmate, including those in the Diagnostic Unit, must be involved in some kind of productive activity at least 8 out of every 24 hours.

b. The Principle of Motility. Excessively restrictive confinement is cruel and unusual punishment. No prisoner, including those in the Diagnostic Unit, may be housed in less than 80 square feet for 20 or more hours a day. If the confining space decreases from 80 square feet, the hours of confinement therein must be reduced proportionately.

c. The Principle of Health. Mental and physical health must be maintained. Treatment and medication, nutrition, exercise and access to others must be provided without delay, without interference by nonmedical personnel and at a level equal to the present state of medical art. Preventive medicine and therapy may not be withheld if such would cause or permit deterioration. The environment and food preparation and delivery must meet existing Colorado Health Department standards.

d. The Principle of Integrity and Safety. This principle is directed toward the reduction of stress. Guards and staff may not be worked beyond endurance either because of extensive work hours or insufficient personnel to accomplish needed tasks with due attention to the responsibility to treat inmates fairly and protect them from harm.

e. The Principle of Coherence. This principle means that any systems of classification, placement and assignment must be clearly understandable, consistently applied and conceptually complete. Methods of validation must be implemented and means of redress for irregularity must be provided.

In sum, if defendants wish to obtain relief from this order of closure, they must take immediate steps to provide the plaintiff class, including those in the Diagnostic Unit, with the basic human needs which I have discussed. I believe this is the least intrusive action I can take. It is up to defendants to plan and implement programs. It is up to me to make sure that such programs meet constitutional minima.

If defendants continue to desire relief from this order, I will consider further stays upon a showing that defendants are proceeding without delay in accordance with the principles I have set out and upon a further showing of what steps will be taken during the ensuing stay of execution. It is further

ORDERED that the injunction ordered herein is considered to be a claim separate and apart from other claims, including those for costs and attorneys' fees, within the context of Rule 54(b) of the Federal Rules of Civil Procedure. There being no just reason for delay, the Clerk of the Court is instructed to enter this Memorandum Opinion and Order forthwith as Judgment in order to make this order immediately appealable. This Memorandum Opinion and Order is no way stays, modifies or amends those emergency orders which I made in my bench ruling. The emergency orders remain in full force and effect and will be treated as such.

## ORDER

KANE, Judge.

### ON MOTION FOR STAY OF EXECUTION

This case is before me on a number of motions, the most important of which is the defendants' motion for a stay of execution pending the appeal of this court's order of December 20, 1979. The other motions are to vacate an existing order staying execution and to compel discovery.

On November 15, 1979, after five weeks of trial, I determined that conditions at the State of Colorado's maximum security prison violate prisoner's federal constitutional rights, as well as a substantial number of state laws. Several bench orders were issued directing immediate attention to certain emergency matters, primarily in the area of health care. On December 20, 1979, this bench ruling was supplanted by a 75 page memorandum opinion and order that sets out the findings of fact and conclusions of law reached in this case. In granting relief to the plaintiff class, I ordered that "Old Max shall be closed," subject to a 45 day stay of execution in order for defendants to come forward with a detailed plan outlining the good faith efforts that defendants will undertake to remedy the violations proven at trial. The order expressly states that further stays will be considered so long as defendants continue with good faith efforts to correct the conditions which violate the Constitution of the United States and the laws of the State of Colorado. On December 26, a hearing was held at which all parties were present. At the hearing the December 20 order was explained several times. On December 28, the defendants filed a notice of appeal.

The defendants' proposed plan was due to be filed on February 4, 1980. On January 31, a status conference was held in chambers at which time defendants indicated that their report would be filed according to the February 4 schedule. Defendants also indicated that they would file a motion for stay pending appeal. Counsel for plaintiffs said that they would need time to review the plan and that they might request a limited amount of discovery regarding the proposed action. I indicated that any immediate motions would be set for hearing at the end of the week of February 4, and that a hearing on defendants' proposals would be set no later than March 11, 1980.

On February 4, the day the plan was due, defendants moved for a one-day extension of time because of the breakdown of a computer involved in the plan's preparation. The request was granted, and on February 5, defendants filed their proposed plan of action and a motion for stay of further proceedings pending appeal. Plaintiffs filed a motion for expedited discovery on the same day, as they had indicated was likely at the status conference a few days earlier. I granted this motion on February 6, and on the same day, extended the stay of execution pending further order, so that counsel for plaintiffs and I would have time to review defendants' proposed plan of action. Other events have occurred since this order of February 6, but are better understood in the context of the discussion which follows.

A hearing was held on the pending motions on February 13. The hearing was required because the defendants' motion for a stay pending appeal simply failed to comply with the requirements of Rule 62 F.R. Civ.P. During the hearing I attempted, with minimal success, to find out the specific grounds for appeal. For instance, the defendants alleged that I made findings unsupported in the record. When asked to specify I was told that the trial transcript was unavailable and no examples could be given. Whether this is a violation of Rule 11 F.R.Civ.P. I leave undecided. In any event I shall consider the representations of counsel at the February 13 hearing as well as the printed pages of the motion. The memorandum opinion and order filed on December 20, 1979 is 75 pages long. Repetition of its findings and conclusions is neither appropriate nor necessary. There is nonetheless an apparent need for further clarification of several matters so reference will be made to that memorandum opinion and order throughout this order.

It is singularly important to observe that here the defendants seek a stay of proceedings pending their appeal of the judgment entered on one claim among many and which I certified in accordance with Rule 54(b) F.R.Civ.P. In order to rule on this motion for stay I must consider four factors: 1) whether defendants have shown that they have a *substantial* likelihood of prevailing on the merits of the appeal; 2) whether defendants have shown *irreparable*

injury if the stay is not granted; 3) whether a stay will *substantially* harm the other parties to the litigation; and 4) whether the public interest is best served by granting or denying the stay. *See Battle v. Anderson,* 564 F.2d at 397.

# I

WHETHER DEFENDANTS HAVE SHOWN THAT THEY HAVE A SUBSTANTIAL LIKELIHOOD OF PREVAILING ON THE MERITS OF THE APPEAL

## A. ABSTENTION

Defendants argue that I should have abstained from deciding this action pending the outcome of certain state proceedings. The argument was first raised by way of motion on April 7, 1978. After briefing by the parties and oral argument, the motion was denied on May 17, 1978. The argument is the same now as it was then.

■ It is fundamental that a party having a federal constitutional claim is normally entitled to have that claim determined in a federal forum. As Judge Murrah said in *Stapleton v. Mitchell,* 60 F.Supp. 51, 55 (D.Kan.1945):

> We yet like to believe that wherever the Federal Courts sit, human rights under the Federal Constitution are always a proper subject for adjudication, and that we have not the right to decline the exercise of that jurisdiction simply because the rights asserted may be adjudicated in some other forum.

*See Zwickler v. Koota,* 389 U.S. 241, 248, 88 S.Ct. 391, 395, 19 L.Ed.2d 444 (1967) and *McNeese v. Board of Education,* 373 U.S. 668, 674 n. 6, 83 S.Ct. 1433, 1437, 10 L.Ed.2d 622 (1963) (quoting Judge Murrah with approval). As the Tenth Circuit recently said in *Clappier v. Flynn,* 605 F.2d 519, 528 (10th Cir. 1979), in another Eighth Amendment case:

> It is well settled, of course, that if the actions of [state officials] result in a deprivation of a federally protected right, the existence of an adequate state remedy does not bar recovery under 42 U.S.C. Sec. 1983. See: *Egan v. Aurora,* 365 U.S. 514, 81 S.Ct. 684, 5 L.Ed.2d 741 (1961). The 'federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.' *Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961), *overruled in part, Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

■ Abstention is not a matter of jurisdiction, but of trial court discretion. *See Western Food Plan, Inc. v. J. D. MacFarlane,* 588 F.2d 778 (10th Cir. 1978). A number of federal courts have found that abstention was not warranted in prisoners' rights litigation, and retained jurisdiction. *See, e. g., Procunier v. Martinez,* 416 U.S. 396, 400–04, 94 S.Ct. 1800, 1805–07, 40 L.Ed.2d 224 (1974); *McRedmond v. Wilson,* 533 F.2d 757, 760–64 (2d Cir. 1976); *Taylor v. Sterrett,* 499 F.2d 367, 368 (5th Cir. 1974), *cert. denied,* 420 U.S. 983, 95 S.Ct. 1414, 43 L.Ed.2d 665 (1975); *Jones v. Metzger,* 456 F.2d 854, 856 (6th Cir. 1972). The only recognized abstention doctrine that defendants raise in their motion is *Pullman* abstention. At the hearing, defendants also mentioned the abstention doctrine arising in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and subsequent cases. Neither are applicable here.

■ The primary purpose of the *Pullman* doctrine is to avoid the unnecessary determination of federal constitutional questions. *See Railroad Commission v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The requirements for the doctrine to apply are as follows:

> The Court must determine (1) whether the state law is unclear and, if it is, whether the state court resolution of the unclear state issue will obviate or modify the federal constitutional issue, and (2) whether the costs of abstention are too great in a particular case where there is some other aspect of the case in favor of or against abstention.

1A (Part 2) J. Moore, *Moore's Federal Practice* ¶ 0.203[1], at 2115 (2d ed. 1977).

██ The second doctrine is found in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) which I will refer to as the *Younger* doctrine. It is concerned with the avoidance of the use of federal courts as a means of collateral attack on enforcement actions brought by a state government in its own courts.

██ Defendants' argument is based on the fact that certain actions were pending in the state courts at the time of their motion. These were *Morrison v. Lamm*, Civil Action No. C–66722, in the District Court in and for the County of Denver, State of Colorado, filed on September 15, 1976; *Johnson v. Leidig*, Civil Action No. C–69544, also in the Denver District Court, Amended Complaint filed on August 22, 1977; and *Duran v. Lamm*, Civil Action No. 78438, Denver District Court, filed on or around April 11, 1978. The action here was commenced on November 30, 1977. Defendants argue that these state actions presented a number of issues similar to those in this action, and that this court should have abstained while those actions were decided. While the argument has little or nothing to do with *Pullman or Younger* abstention, a review of the state actions shows that abstention, in whatever form, was not appropriate. First and generally, none of these actions was initiated by the same plaintiffs. While one, *Morrison v. Lamm*, was initiated with class certification in mind, no class had been certified when defendants' earlier motion was made. The other two actions were solely individual claims by particular plaintiffs. As I will discuss below the track record of the defendants does not justify an assumption that anyone other than the named individuals might benefit from decisions in those cases.

In *Morrison*, the only issue present at the time of this court's denial of defendants' motion was whether the State of Colorado could administratively segregate inmates who had not been charged with any specific violation of law or prison rule and at the same time refuse to allow those inmates to earn good time. While the conditions of confinement in administrative segregation have been litigated in the present action, the issue in *Morrison* was neither presented nor decided by this court. In *Johnson v. Leidig*, a single plaintiff alleged that he was receiving inadequate mental health care, in violation of both the federal constitution and state law. Again, while the decision in this case clearly addresses the adequacy of mental health care at Old Max, it does so on a system-wide basis. The decision was not precluded by an individual complaint being asserted in a pending state proceeding.

Finally, *Duran v. Lamm* was not pending at the time the present action was filed, but was commenced afterward. A review of that complaint does show substantial similarity with the issues presented here. The action was commenced by two individual plaintiffs then confined in the Denver County Jail who sought to enjoin their transfer back to Old Max, at least so long as its alleged problems continued to exist. That subsequent action could not preclude plaintiffs here from their choice of a federal forum. If anything, the contrary might have been true; that is, the plaintiffs in *Duran* might have been expected to rely for relief on the class action here. They apparently found that option less attractive, since they were not then present at Old Max and did not want to return.

Defendants do not indicate how the above facts relate to an argument for *Pullman* abstention. The only authority they cite is *Smith v. State of Kansas*, 356 F.2d 654, 656 (10th Cir. 1966), *cert. denied*, 389 U.S. 871, 88 S.Ct. 154, 19 L.Ed.2d 151 (1967), *rehearing denied*, 389 U.S. 1010, 88 S.Ct. 567, 19 L.Ed.2d 612 (1967), a case dealing with the exhaustion requirement in habeas corpus proceedings and having nothing to do with abstention. They do not assert that the state actions would have resolved unclear questions of state law that would have obviated the need to decide a federal constitutional question. It is clear that plaintiffs' action here, while including pendent state

claims,[1] is primarily concerned with federal constitutional law. At the very most, resolution of some state law issues would not have caused the action here to disappear, even though defendants may have wished it so.

The single part of my decision to which *Pullman* might arguably apply is the conclusion that Colorado law requires that all able-bodied prisoners be put to work at some employment. But that hardly seems an "unclear" matter of state law. The Colorado statute at C.R.S. § 17–20–117 (1978), expressly states: "Every able-bodied offender shall be put to and kept at the work most suitable to his capacity and most advantageous to the people of this state." *Also see* C.R.S. §§ 17–20–115, 17–24–102(1) (1978). The language is clear on its face and consistent with declarations of the legislature's purpose. *See* Memorandum Opinion and Order, December 20, 1979, at 52. In such cases, abstention is not required. *See Zablocki v. Redhail*, 434 U.S. 374, 379 n. 5, 98 S.Ct. 673, 677, 54 L.Ed.2d 618 (1978); *Procunier v. Martinez*, 416 U.S. 396, 400–04, 94 S.Ct. 1800, 1805–07, 40 L.Ed.2d 224 (1974); *Wisconsin v. Constantineau*, 400 U.S. 433, 437–39, 91 S.Ct. 507, 510–11, 27 L.Ed.2d 515 (1971); *United States v. Bureau of Revenue of State of New Mexico*, 291 F.2d 677, 679–80 (10th Cir. 1961). Nor is this the sort of state law question that, if resolved, would have precluded the action here.

The *Younger* doctrine clearly does not apply. As the summary of the state proceedings indicates, this is not a case where a defendant in a state enforcement action has sought to enjoin such action in federal court.

### B. FINDINGS AND CONCLUSIONS

Defendants contest the court's findings and conclusions, but they have not presented any evidence or authority which suggests that those findings or conclusions should be otherwise. In fact, they have not even indicated which of those findings and conclusions they contest. In short, there is nothing in the motion but the bare assertion that defendants believe that I am wrong. It is an exercise in *ipse dixit.*

### C. CLASS CERTIFICATION

The other grounds which defendants assert make it likely they will succeed on appeal are even more ephemeral. It is suggested that I acted without jurisdiction, but I believe the congress has given me jurisdiction in 1983 cases. Defendants assert error in the certification, scope and definition of the plaintiff class. No argument is given in support of this assertion and I think I know why. First it is absurd since the certification meets every known standard. Second, the first eight pages of my memorandum opinion and order make it abundantly clear why consolidation and class action treatment of prisoner cases in this district is absolutely essential to administration of the court's business. Third, as previously stated, the track record of defendants is not favorable in this area. In *Romero v. Schauer*, 386 F.Supp. 851 (D.Colo.1974), a three-judge court, consisting of Judges McWilliams, Arraj and Winner, established the due process and equal protection rights of state hospital patients regarding transfers to the state penitentiary upon an administrative determination that they are too dangerous to continue to be confined at the state hospital. Evidence in this case, especially regarding Darrell Howell, shows that these rights have not been observed. In *Gurule v. Wilson*, Civil Action No. 74–A–926 (D.Colo. Apr. 3, 1978), Judge Arraj determined the procedural due process rights of Colorado prisoners regarding their regressive classification and transfer to more restrictive cellblocks. Because the suit was not certified as a class action, it appears that the state defendants extended the procedural rights to the named plaintiffs and then returned to business as usual. That situation has caused another lawsuit

---

1. Jurisdiction of such claims is clear. *See, e. g., Taylor v. Sterrett*, 499 F.2d 367, 368 (5th Cir. 1974); *Palmigiano v. Garrahy*, 443 F.Supp. 956, 980 (D.R.I.1977), *appeal dismissed*, 599 F.2d 17 (1st Cir. 1979).

to be filed in this court, *Marioneaux v. Colorado State Penitentiary*, Civil Action No. 78-K-1065 (D.Colo. Oct. 12, 1978), which has been certified as a class action. It is an exact reprise of *Gurule* and a preliminary injunction has been entered. *See* 465 F.Supp. 1245 (D.Colo.1979). When the substantial and continuing history of constitutional violations at the state prison, the consistent need for continued jurisdiction in other prison cases, and the state's own track record are viewed together, I find that class action treatment is more than warranted.

## D. THE REMEDY

Defendants also seek reversal of the remedy. This assertion is truly the most astonishing of all. As stated in the memorandum opinion and order, the five week trial was most notable for the lack of objections and the almost total absence of conflict in the evidence. In addition, the order of closure was precisely the relief asked for by the defendants. Of course I attached certain conditions to the order of closure which were not asked for, but which I believe are minimal and the least intrusive conditions yet imposed to my reckoning on any state defendant in a prison conditions case. If indeed, I was in error it was on the side of restraint. All that the remedy requires, in essence, is that the state develop its own plans and make good faith immediate and continuing efforts to implement those plans so that the numerous constitutional violations set forth in my memorandum opinion and order will neither be repeated nor advanced. This is the proceeding which defendants wish me to stay!

In order to reach this position defendants have confused and confounded my opinion and order of December 20, 1979 to the extent that I think amounts to recalcitrance. From that time to the present, defendants have persisted in reading three sentences out of context. They continue in the present motion for stay in which they quote: "ORDERED that Old Max shall be closed. It will no longer be used to confine inmates either temporarily, permanently or on a standby basis. Defendants herein are forever enjoined from confining members of the plaintiff class in the Canon Correctional Facility." (Motion for Stay, at 2.) The order was repeatedly explained at the December 26 hearing, apparently to no avail. No one except defendants appears to have had such difficulty understanding the order.

First, the order says that Old Max "shall" be closed, not that it is closed. It is clear that Old Max will be closed when the new facilities become available. That is not only conceded, but in fact desired, by the state's correctional officials. It is the precise ruling which they requested. Whether Old Max is closed before that time is completely up to the willingness of defendants to make good faith efforts to bring the prison into compliance with the federal constitution. The order makes that abundantly clear.

While defendants recognize that a 45 day stay of execution immediately followed this part of the order, they continue to act as if the order means that the prison will be automatically closed on the expiration of the 45 days. Again, whether closure occurs is up to defendants. I did not anticipate at the time of the order that such closure would be called for. I still do not and, even if I did order closure, defendants would have the right to seek a stay of execution of that order in the Court of Appeals. At best the present request is premature and at worst it is a bugaboo. Defendants were directed to come forward during the period of the stay with a good faith plan "that assures immediate attention to bringing [the] corrections system into constitutional compliance." The order states that upon presentation of such a plan, the stay would be extended and that further stays would be considered "upon a showing that defendants are proceeding without delay in accordance with the principles I have set out and upon a further showing of what steps will be taken during the ensuing stay of execution." The remedy is hardly "draconian" as asserted in defendants' motion.

Defendants complain that I have intervened too much, that I have taken over the supervision of the prison. That could not

be further from the truth. From page one of the December 20 decision, I expressed a great measure of deference toward state officials, and made it clear that I have no intention of running the prison. The order is hardly a catalog of things to do and when to do them. Maximum latitude is afforded to the state's prison officials. The irony of defendants' allegations is that they also complain that I have not *sufficiently* told them what they have to do. The order is a public document that all are entitled to review. If it amounts to running the prison, then prisons require no personnel.

The defendants have complicated our present situation since they expressly tell me that the plan which they have submitted is not the plan which this court requested. The motion for stay says at page 16:

> What must be kept uppermost in mind, however, is that this plan is not the compliance plan contemplated by the court at page 73 of its order, but is independent from that plan and is presented to set forth the continuing good faith of the state and to indicate that the public interests demands that such a plan be implemented free of court interference, e. g., compliance hearings.

On February 7, following the order of February 6 which extended the stay to allow time to review defendants' plan, defendants filed a motion to vacate the stay. Again they indicated that the plan was not prepared as the good faith proposals requested by the court.

> 2. Both the plaintiffs' motion [to allow discovery] as well as the court's order mistakenly characterized the report filed with the court on February 5, 1980 as "a report setting forth (the defendants') proposal for compliance" which is in fact contrary to what in fact was filed with the court on February 5, 1980 (see defendants' motion for stay of proceedings pending appeal pursuant to Rule 62, Federal Rule Civil Procedure at page 16).
>
> 3. At no time did the defendants represent that any plan that would be filed with the court would be the plan of compliance referred to in the judge's order of December 21, 1979 at page 73.

The plan was nonetheless prepared after this court's bench ruling of November 15, 1979, as demonstrated by the following paragraphs of defendants' own motion:

> 10. The Colorado Medical Society Committee on Correctional Health Care and Jails is *presently* meeting to provide general evaluation of the medical care available at CCF and what that society can do to improve such care.

> . . . . .

> 26. The Department of Corrections has organized 13 task forces to study and evaluate the problems defendants have identified within CCF (see attached exhibit E). Those task forces have expended 4,135.25 man hours *since December 15, 1979. As a result of the concentrated efforts of the task forces*, a plan of action of the Department of Corrections has been formulated and submitted to the Colorado Legislature (see attached DOC plan of action). The plan calls for the *immediate* hiring of 77.4 additional fulltime employees. . . .
>
> 27. The DOC's *new* "Mission Statement" for the treatment of offenders is contained in DOC regulation 102–7, *dated December 3, 1979* (see exhibit F).

(Motion for Stay, at 10, 14–15; emphasis added.)

A careful review of the 97 page plan shows that it was obviously prepared by knowledgeable corrections officials in a good faith effort to comply with the December 20 order and then sanitized by counsel to meet the appetites of this rather turgid argument.

The vast majority of the steps that defendants have taken or propose to take are in direct response to problems identified in my bench ruling and my written order, as demonstrated by the following paragraphs of defendants' motion:

> 1. *On January 1, 1980*, George S. Williams, M.D., was hired as the fulltime staff physician at CCF. . . .

> . . . . .

4. The department is presently advertising and interviewing applicants for two registered nurse positions within the infirmary. . . .

. . . . .

7. Dr. John Barnard, an orthopedic surgeon, has indicated a willingness to take on all of the CCF orthopedic patients on a case-by-case basis. . . .

. . . . .

9. The department is currently searching for a fulltime psychiatrist to be employed at CCF. . . .

. . . . .

11. Two (2) 1978 Chevrolet Impala stationwagons have been purchased at a cost of $7,398. They went into service on *December 20, 1979* and are for the sole purpose of transporting inmates for medical services outside of CCF.

. . . . .

14. A new roof has been placed on cellhouse 3 *as of November 30, 1979.* The cost of this project was $58,790.

. . . . .

21. Contacts have been made with Denver bridge and chess clubs *in order to* establish chapters within CCF.

. . . . .

25. Psychiatric evaluations of prisoners in cellhouses 3, 7 administrative segregation, and 7 punitive segregation have been completed. A total of 140 evaluations have been made. . . . Immediate treatment needs of 35 of those inmates were identified (see attached exhibit C) and are currently being implemented. The Department of Institutions has *devised a plan* for the screening of the remaining inmates.

(Motion for Stay, at 10–14; emphasis added.) Finally, the plan was filed within the time schedule provided by the court, after

an extension of time requested by defendants in order that they would be able to meet the deadline. However defendants' counsel choose to characterize the plan, I will call it by its title, which is "Plan of Action." [2]

For the reasons discussed I find that defendants have failed to make a showing whether strong or substantial that they are likely to prevail on the merits of the appeal. I have reviewed my opinion and order line-by-line to see if there is any conclusion of law which might be error or even to see if there is any conclusion which is without precedent. I find none.

## II

### WHETHER DEFENDANTS HAVE SHOWN IRREPARABLE INJURY IF THE STAY IS NOT GRANTED

There is no showing that irreparable injury will result if the stay is not granted. The memorandum opinion and order requires good faith efforts to bring the corrections system into compliance with the federal constitution. The spectre of "closure . . . upon expiration of the forty-five (45) day stay of execution," (Motion for Stay, at 6) or "premature release" of prisoners (Motion for Stay, at 7) is unfounded and chimerical. The matter of immediate closure has been discussed, and, as I said, it is a matter entirely up to defendants. No one has suggested or requested the premature release of prisoners, least of all me. The steps which defendants take to comply with their legal obligations will be viewed with substantial deference so long as they are taken in good faith. No more has been required and I could not, in good conscience, require less. As the trial court said in *Battle v. Anderson,*

> The Court has only decreed that the . . . conditions . . . must be eliminated . . . . . The details and administration

---

**2.** A somewhat similar approach was taken by Oklahoma officials in *Battle v. Anderson.* Defendants there argued that the trial court's order should not be allowed to infringe upon or add to a plan that the state had previously prepared. The United States responded "that,

in fact, the Plan was not written until after the trial court's May 24, 1977, bench ruling and was not presented to the parties until June 13, 1977. The record," said the court of appeals, "confirms this contention." 564 F.2d at 401.

of a program are left solely to the discretion of the defendants. The Court is interested in ends and not means so long as they are lawful. Defendant further contends that the Order 'will unduly disrupt the orderly operation of the penal institutions of the State of Oklahoma.' This presumes that the prolongation of the unconstitutional conditions is essential to the 'orderly operation' of the system. The Court rejects the idea that constitutionality is incompatible with orderliness and that a constitutional operation is by definition disorderly.

Quoted at 564 F.2d at 398.

The posture that defendants have taken regarding their plan makes all of this talk of irreparable harm a matter of gross speculation. According to defendants, the outlined actions are what they are going to do anyway, without any reference to what might be required. No one has reviewed the plan or commented upon it. If the plan represents a good faith effort and defendants continue that effort, which is what they say they are going to do anyway, where is the irreparable harm imposed by this court? Defendants' motion is at the very least premature.[3]

III

WHETHER A STAY WILL SUBSTANTIALLY HARM THE OTHER PARTIES TO THE LITIGATION

In the motion for stay defendants deny the existence of any constitutional violations. The findings of fact were made, however, on the basis of a five week trial and, as has been repeatedly stated, on the basis of almost entirely uncontradicted evidence. If the unconstitutional conditions at Old Max such as inadequate medical care and treatment, pervasive idleness and lock

down continue unabated pending appeal, it is certain that the plaintiff class will suffer substantially. There has already been another suicide, more self-mutilations and physical injuries to inmates since the order and under the conditions which have continued since the adjudication.

Defendants have presented a plan of action that they say they intend to pursue independent of this court's order. The assertion is nothing more than gross dissimulation. The truth of the matter is that the plan is a direct result of this litigation and this court's order. Defendants have set forth a number of steps that they say have been taken during the past seven months to improve conditions at Old Max. (Motion for Stay, at 9–16.) Such improvements are commendable but it is clear that those efforts began only several months prior to trial, and that the great bulk of them have taken place only since November. Such is not grounds for criticism of the efforts themselves but it belies their "independence" and suggests the importance of this court's continued jurisdiction. A stay of proceedings will, as demonstrated during the interim from November 15, 1979 to this date, cause substantial harm to the other parties to this litigation. While technically speaking the employees at Old Max are not parties to this litigation, I cannot help but observe that they, too, in all probability, may suffer substantial harm if proceedings are stayed.

What it comes down to is this: the balance that defendants ask me to strike is between substantial and continuing harm to plaintiffs on the one hand and defendants' dislike of any sort of compliance hearings on the other. I think it is evident, given the above discussion of the issues, that the balance must be struck in favor of plaintiffs.

---

**3.** As far as the amounts of money that might have to be spent to improve conditions at Old Max, I note that of the $1,122,915.40 that is mentioned in paragraph 31 at page 15 of defendants' motion as benefiting the present facility, $945,825, or 85 per cent, is for the purpose of increasing staff, not for physical improvements. Adequate staff will be just as necessary at the new facility as it is at Old Max.

While I certainly found that inadequate staffing was one of the primary problems at the prison, I did not attempt to set out a required number of additional positions. Instead, deference was given to prison officials, who have had a free hand in calculating the number of staff that they believe required. The plan, it must be remembered, is at yet unexamined.

## IV

## WHETHER THE PUBLIC INTEREST IS BEST SERVED BY GRANTING OR DENYING THE STAY

I have always entertained the somewhat wistful notion that the public interest is best served by dedicated observance to the rule of law on the part of government as well as individuals. Unless and until reversed by a higher court, the rules of law and orders implementing them remain in full force and effect and it thus seems that adherence best serves the public interest. We are all aware of the recent horrible tragedy at the state prison in New Mexico. Compared with the estimated cost of rebuilding there, the costs involved in correcting the unconstitutional conditions at Old Max are a pittance. If conditions at Old Max continue unabated, I cannot say with confidence that such an occurrence there is unlikely. It has happened before. I hesitate even to mention the possibility, but this motion for stay requires me to do so.

Judge Bohanon addressed very similar matters in *Battle v. Anderson.* His responses supplement my own. Defendants suggest that the question of the stay in *Battle* is distinguishable, since Oklahoma did not contest the court's findings and conclusions. That is not correct. *See Battle v. Anderson,* 564 F.2d at 399, 400. Even if defendants were correct that Oklahoma did not contest the trial court's decision, I see little difference between concession on the one hand and uncontradicted evidence on the other. Defendants stipulated, for instance, that according to their own corrections studies, "the housing facilities at Old Max are totally obsolete and continued use can only lead to an ongoing series of challenges to the constitutionality of [such] use." (Revised Appendix I to Plaintiffs' Pretrial Order, No. 222, at 31–32.) They also stipulated that as of February 1, 1977, "the old maximum security prison was below current correctional standards for housing and programming in the following ways: a. Size of living units; b. Day space; c. Lighting; d. Ventilation; e. Life safety requirements." (Revised Appendix I to Plaintiffs' Pretrial Order, No. 17, at 3.) Paul Silver, a recognized corrections architect called as an expert witness by defendants, characterized the main living areas at Old Max as unfit for human habitation. The evidence was uncontradicted that at the time of trial there was a *maximum* of ten hours a week of on-site physician coverage at Old Max, even though defendants stipulated that "[a] minimum of 40 hours per week of on-site primary care physician coverage is needed for the Maximum Security Prison to meet minimally acceptable standards of health care." (Revised Appendix I to Plaintiffs' Pretrial Order, No. 341, at 59.) Defendants also stipulated that transitional workers remain in their cells approximately 20 hours a day, and that they cannot use the hobby shop. (Revised Appendix I to Plaintiffs' Pretrial Order, Nos. 1010, 1012, at 134.) The list could go on, but little additional purpose would be served.

Stripped of its hyperbole, the only basis asserted in defendants' motion for stay is that they would prefer not to be subject to continuing federal court jurisdiction. As a general matter, that is understandable. As I explained in the memorandum opinion and order of December 20, at pages 129 through 132, the United States District Court in Colorado has shown much concern for the principles of federalism and great deference toward state officials. But as I also said, regarding this case, "[e]xcept in fashioning the necessary relief, deference is no longer possible." *See Procunier v. Martinez,* 416 U.S. at 405–06, 94 S.Ct. at 1807; *Bethea v. Crouse,* 417 F.2d 504, 505–06 (10th Cir. 1969).

Extensive efforts were made to settle this case. A final proposed settlement was drafted, but certain constituent elements of the state government would not allow it, even though counsel for defendants now says publicly that he knew the state was going to lose anyway. The refusal to settle was certainly within defendants' rights and they may have found it the expedient thing to do. But the fact of the matter is that the case was jurisdictionally here and did go

to trial. Now that the trial is over and judgment has been entered, defendants cannot avoid this court's continuing jurisdiction by wishing that they had settled after all.

 The history of prison litigation shows an unfortunate need for continued jurisdiction, *see, e. g., Newman v. Alabama*, 466 F.Supp. 628 (M.D.Ala.1979), *Battle v. Anderson*, 457 F.Supp. 719 (E.D.Okl.1978), *Holt v. Hutto*, 363 F.Supp. 194 (E.D.Ark. 1973), *aff'd in part, rev'd in part and remanded sub nom. Finney v. Arkansas Board of Corrections*, 505 F.2d 194 (8th Cir. 1974), and the Supreme Court has recognized the broad equitable power of lower federal courts to remedy continuing constitutional violations. *See Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). *Cf. Milliken v. Bradley*, 433 U.S. 267, 281, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977); *Swan v. Charlotte Mecklenberg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (School cases). That does not create a presumption of bad faith, but there is no basis for relief from judgment in defendants' assurances that everything now will be okay.

For the foregoing reasons, and based upon the findings of fact and conclusions of law contained in the memorandum opinion and order of December 20, 1979, it is therefore

ORDERED that the motion for stay of proceedings is denied. It is further

ORDERED that defendants' motion to vacate order of February 6, 1980 which authorized expedited discovery is denied. It is further

ORDERED that plaintiffs' motion to compel attendance at depositions and production of documents is granted.

All other orders including the emergency orders relating to medical care issued from the bench on November 15, 1979 and the order continuing the stay of execution of the order of closure are continued in full force and effect. Since it is obvious that defendants will now seek a stay of proceedings in the Court of Appeals, I will not set the matter for hearing concerning a review of defendants' plan of action at this time. I do expect, however, that discovery will proceed as ordered unless and until the Court of Appeals grants a stay of all proceedings.